693 A.2d 378

Antoine **TRAVERS**

v.

**BALTIMORE POLICE DEPARTMENT**

No. 1325, Sept.Term, 1996.

Court of Special Appeals of Maryland.

May 6, 1997.

398

G. Matthew Immler (Schlachman, Belsky & Weiner, P.A., on the brief), Baltimore, for Appellant.

Bernard Ilkhanoff, Assistant Solicitor (Frank C. Derr, Deputy Solicitor, on the brief), Baltimore, for Appellee.

Argued before MOYLAN, HARRELL and SONNER, JJ.

HARRELL, Judge.

Antoine Travers, a former member of the Baltimore City Police Department (the Department), was charged with violating various rules and regulations promulgated by the Department. The Police Commissioner, in accordance with a hearing board's finding of guilt as to all charges and recommendation of termination, issued a final order terminating Mr. Travers's employment with the Department. The Circuit Court for Baltimore City affirmed the Department's final order. Mr. Travers appeals his termination to this court contending (1) procedural violations and (2) that some of the board's findings were not supported by sufficient evidence. Because we conclude that the board's findings as to two of the specifications supporting the charges against appellant were not supported by substantial evidence, we must vacate the judgment of the

circuit court and instruct it to remand this case to the Department to reconsider what action it shall take against appellant in light of our decision.

## *ISSUES*

Appellant presents the following issues, rephrased by us as:

1. Whether the board committed legal error by admitting the hearsay testimony of Lieutenant James Henderson and Officer John Moore concerning appellant's alleged assault on Ms. Elizabeth Nelson.

2. Whether the decision of the board was supported by sufficient evidence.

## *FACTS*

As a result of an off-duty incident occurring on 23 October 1994, the Baltimore City Police Department, on 14 August 1995, charged appellant with various violations of Departmental Rules and Regulations. We have excerpted the Department's charging document as follows:

## *CHARGE 1*

**Violation of Rule 1, Section 13**

Section 13: No member of the department shall at any time be insubordinate or disrespectful to a superior.

Specification: On or about [23 October 1994], Police Officer Antoine Travers was insubordinate and disrespectful to superior officers when he failed to leave the apartment of Ms. Elizabeth Nelson as directed by Lieutenant James T. Henderson.

## *CHARGE 2*

**Violation of Rule 1, Section 14**

Section 14: No member of the department shall willfully disobey any lawful command or order, either verbal or

written, of any superior or other member designated to command.

Specification 1: On or about [23 October 1994], Police Officer Antoine Travers disobeyed a lawful command or order from Lieutenant James T. Henderson to leave the apartment of Ms. Elizabeth Nelson.

Specification 2: On or about [12 January 1995], Police Officer Antoine Travers disobeyed a lawful command or order from Major Barry Powell to appear at the offices of the Internal Investigation Division on [25 January 1995].

## CHARGE 3

### Violation of Rule 1, Section 18

Section 18: No member of the department shall intentionally violate any Federal or State law or City ordinance.

Specification: On or about [23 October 1994], Police Officer Antoine Travers assaulted and battered Ms. Elizabeth Nelson.

## CHARGE 4

### Violation of Rule 1, Section Conduct

Rule 1, Conduct: Any breach of the peace ... or any conduct on the part of any member of the department, ... which tends to undermine the good order, efficiency or discipline of the department, or which reflects discredit upon the department or any member thereof, or which is prejudicial to the efficiency and discipline of the department, even though these offenses may not be specifically enumerated or laid down, shall be considered conduct unbecoming a member of the Baltimore Police Department, and subject to disciplinary action by the Police Commissioner.

Specification 1: On or about [23 October 1994], Police Officer Antoine Travers was insubordinate and disrespectful to

superior officers when he failed to leave the apartment of Ms. Elizabeth Nelson as directed by Lieutenant James T. Henderson.

Specification 2: On or about [23 October 1994], Police Officer Travers disobeyed a lawful command or order from Lieutenant James T. Henderson to leave the apartment of Ms. Elizabeth Nelson.

Specification 3: On or about [12 January 1995], Police Officer Antoine Travers disobeyed a lawful command or order from Major Barry Powell to appear at the offices of the Internal Investigation Division on [25 January 1995].

Specification 4: On or about [23 October 1994], Police Officer Antoine Travers assaulted and battered Ms. Elizabeth Nelson.

A Departmental Trial Board hearing was conducted on 4 December 1995 to adjudicate those charges. We have excerpted the relevant portions of the board's Finding[s] of Fact that accurately summarized those proceedings.

Officer [John] Moore testified that on [23 October 1994] at 0351 hours he . . . responded to 2433 Brambleton Road, Apt. 3D. . . . Officer Moore was called . . . to take an assault report from Ms. Elizabeth Nelson. . . . Ms. Nelson reports she returned to her home . . . to find the door locked and a chain on the door. In an attempt to get the attention of her boyfriend, Officer Travers, who was inside, Ms. Nelson rang the buzzer, knocked on the door and set off Officer Travers'[s] auto alarm. After getting no response at the door, Ms. Nelson squeezed into the apartment. She found Officer Travers in the bedroom. After a brief pushing encounter, Ms. Nelson called Officer Travers'[s] sister and was advised by her not to say anything to Officer Travers. Ms. Nelson reports she laid down in bed at which time Officer Travers grabbed her by the neck, threw her against a wall, and slapped her twice. Ms. Nelson reports she scratched Officer Travers on the arm after being slapped. Officer Moore

testified Ms. Nelson did not require medical attention and he did observe her face was "puffy"....

Lieutenant James T. Henderson ... testified. [He] reports he responded to the scene of a domestic assault at the request of Sergeant [Reginald] Hendrix. Lieutenant Henderson testified that upon his arrival, he found the following people present: Ms. Nelson, her mother, Officer Travers, Sergeant Hendrix, Officer Moore and Officer Byron Carter. After speaking with Sergeant Hendrix and seeing a rent receipt in Ms. Nelson's name, Lieutenant Henderson observed redness on Ms. Nelson's neck and a puffy face. Lieutenant Henderson advised Officer Travers to leave the apartment. When Officer Travers refused, Lieutenant Henderson informed Officer Travers of his need to keep his job.... Again, Officer Travers refused. Lieutenant Henderson then told Officer Travers he would be arrested if he did not leave. Concerned for Ms. Nelson's safety, Officer Travers was arrested when he refused to leave. Lieutenant Henderson testified he never "ordered" Officer Travers to leave, but made it clear he should leave. Under re-direct examination, Lieutenant Henderson testified it was possible both Ms. Nelson and Officer Travers were both the legal occupants; however, he did not want Ms. Nelson to leave. Lieutenant Henderson also described Officer Travers as antagonistic and [u]ncooperative. In response to a question from the Board, Lieutenant Henderson testified the only evidence that Officer Travers lived there ... were several bags of clothing on the floor. The Department called Major Barry Powell, C.I.B [Criminal Investigations Bureau], to testify. [He] testified that in January, 1995 ... Officer Travers was assigned to his command. He further testified that on [12 January 1995] he personally ordered Officer Travers to appear at I.I.D. [Internal Investigations Division] on 25 January 1995 to provide a statement.... Under [cross-]examination, Major Powell testified that Officer Travers may have been on Medical Leave on [25 January 1995]; however, he would still be obligated to respond to I.I.D. if he was ambulatory.

Major Powell also cited the officer's responsibility to notify I.I.D. if he [could not] attend.

\* \* \*

... Officer Travers was called to testify and stated he had been on stress medical leave since 24 January 1995. He testified this was caused by his "immediate" transfer to the Central District which occurred on [23 January 1995]. Officer Travers testified that on [23 October 1994] he resided at 2433 Brambleton Road, Apt. 3D and had lived there since February 1994. He also stated his property was there. Officer Travers testified that on 23 October 1994 at 0330 hours he was home in bed. He was awakened when Ms. Nelson came into the bedroom and assaulted him. Officer Travers testified he pushed her off and held her at bay, but he denied choking her. Officer Travers testified that when police arrived, he obeyed when told by the sergeant and later by the lieutenant to "shut up and sit down". He testified that Lieutenant Henderson never told him to leave the apartment and that he was never disrespectful to the [L]ieutenant or any other Officer. Officer Travers also testified that after his arrest, he filed an assault report against Ms. Nelson but never pursued charges. Officer Travers testified that the criminal case against him was dismissed, but later acknowledged that a *nolle prosequi* had, in fact, been entered in the case.... Officer Travers testified that on [24 January 1995] at 0650 hours he called the Central District and reported on "stress medical" to Officer Barnes.... He also testified that he did not have to report to I.I.D. on 25 January 1995 because he was on medical leave and that it was not his responsibility to notify them of his inability to report.

... Officer Travers testified ... that "everything I own" was in the apartment that night.... Officer Travers testified that he did speak with Ms. Nelson before the first Disciplinary Hearing on [12 October 1995], but he denied threatening her if she testified. Officer Travers reluctantly acknowledged that Lieutenant Henderson was his superior

and testified the only thing he, Lieutenant Henderson, asked him on the scene of the domestic assault was, "Do you have a place to go?" Officer Travers also testified he was upset at the time. He also admitted that he was ordered by Major Powell to report to I.I.D. on 25 January 1995 and he failed to appear. There were no other witnesses called by the defense.

\* \* \*

The Board ... [unanimously] concluded there was sufficient evidence to sustain a verdict of guilty to each charge and specification.

The department submitted Officer Travers'[s] personnel jacket/service record to the Board noting it includes the following prior disciplinary action:

| 4/25/90 | Trial Board— Guilty 5 Counts Misconduct/Insubordination | Termination, That termination to be suspended for 12 months, 12 months probation, severe Letter of Reprimand noting future violation is sufficient cause to effectuate termination. |
| 1/23/89 | Neglect of Duty | Severe Letter of Reprimand, Guidance and Counseling noting that future transgression will result in recommendation for termination. |

\* \* \*

... The board weighed the severity of the charges, the testimony and evidence offered during the hearing, the mitigation testimony, and Officer Travers'[s] service record to include his prior disciplinary record.

Ultimately, the board recommended that appellant's employment with the Baltimore City Police Department be ter-

minated. On 18 December 1995, the Police Commissioner approved the board's recommendation, and appellant was terminated effective 29 December 1995. Appellant's Petition for Judicial Review resulted in affirmance by the Circuit Court for Baltimore City of appellee's action.

## ANALYSIS

We begin our analysis by noting the varied sources of procedural safeguards upon which appellant is entitled to rely. First, the requirements of procedural due process as guaranteed by the Fourteenth Amendment to the Constitution and Article 24 of the Maryland Declaration of Rights apply to an administrative agency exercising judicial or quasi-judicial functions. *Maryland State Police v. Zeigler*, 330 Md. 540, 559, 625 A.2d 914 (1993); *Board of Medical Examiners v. Steward*, 203 Md. 574, 582, 102 A.2d 248 (1954). In addition, a police officer confronted with disciplinary proceedings is entitled to the protections afforded by the contested case provisions of the Maryland Administrative Procedure Act (APA), Md.Code, State Gov't § 10–201 *et seq.*, as well as those of the Law Enforcement Officers' Bill of Rights (LEOBR), Md.Code, art. 27 §§ 727–734C. *Zeigler*, 330 Md. at 553, 625 A.2d 914 (1993). *See Mayor and City Council of Ocean City v. Johnson*, 57 Md.App. 502, 516, 470 A.2d 1308 (1984) (police chief's authority to discharge police officers must be exercised in conformance with LEOBR); *Chief, Baltimore County Police Dep't v. Marchsteiner*, 55 Md.App. 108, 116, 461 A.2d 28 (1983) (LEOBR applies when a law enforcement officer is under investigation by a law enforcement agency as a result of a disciplinary-type complaint lodged against officer). Finally, the LEOBR provides for judicial review of a final order by the Baltimore City Police Chief. *See* Md.Ann.Code, art. 27 § 731.

## I.

Appellant's first contention is that, by admitting hearsay statements of the alleged victim, Ms. Nelson, through the testimony of Officer Moore and Lieutenant Henderson, the

board committed legal error.[1] Stated differently, appellant contends that the hearing board allowed Ms. Nelson's testimony to be given vicariously through Officer Moore and Lieutenant Henderson without having her run the gauntlet of cross-examination.

 A reviewing court may reverse the decision of the Police Commissioner if such decision results from unlawful procedure or some other error of law. *See* Md.Code, State Gov't § 10–222(h)(3)(iii)–(iv). Nonetheless, it is well settled that the procedure followed in administrative agencies usually is not as formal and strict as that of the courts. *See Gorin v. Board of County Com'rs for Anne Arundel County,* 244 Md. 106, 110, 223 A.2d 237 (1966); *Standard Oil Co. v. Mealey,* 147 Md. 249, 127 A. 850 (1925). As such, the rules of evidence are generally relaxed in administrative proceedings. *Department of Public Safety & Correctional Servs. v. Cole,* 342 Md. 12, 31, 672 A.2d 1115 (1996); *Dickinson–Tidewater, Inc. v. Supervisor of Assessments,* 273 Md. 245, 253, 329 A.2d 18 (1974). Stated differently, that which is inadmissible in a judicial proceeding is not per se inadmissible in an administrative proceeding. *Powell v. Maryland Aviation Admin.,* 336 Md. 210, 220, 647 A.2d 437 (1994). It follows, therefore, that hearsay evidence that is inadmissible in a judicial proceeding is not necessarily inadmissible in an administrative proceeding. *Maryland Dept. of Human Resources v. Bo Peep Day Nursery,* 317 Md. 573, 595, 565 A.2d 1015, 1025 (1989), *cert. denied,* 494 U.S. 1067, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990).

These principles are embodied in the statutory language comprising the APA and the LEOBR. Section 10–213 of the APA states in relevant part:

(b) *Probative evidence.*—The presiding officer may admit probative evidence that reasonable and prudent individuals commonly accept in the conduct of their affairs and give probative effect to that evidence . . .

---

1. This objection only concerns Charge 3, and Charge 4, Specification 4, the charges involving the alleged assault and battery of Ms. Nelson.

(c) *Hearsay.*—Evidence may not be excluded solely on the basis that it is hearsay.

(1995 Repl. Vol). Under the LEOBR,

> [e]vidence which possesses probative value commonly accepted by reasonable and prudent men [and women] in the conduct of their affairs shall be admissible and shall be given probative effect. The hearing board conducting the hearing ... shall exclude incompetent[2], irrelevant, immaterial, and unduly repetitions evidence.

Md.Ann.Code, art. 27 § 730(e) (Repl.Vol.1996).

■ In drafting the aforementioned provisions of the APA and LEOBR, the General Assembly implicitly recognized that the formal rules of evidence possess far greater utility in jury trials than an agency hearing before a presumably expert hearing officer. One administrative law scholar has commented on this implied purpose as follows:

> There are three reasons why it makes little sense to take the risk of erroneous exclusion of reliable evidence through application of highly technical exclusionary rules in the context of agency adjudications. First, the cost of such errors is as great in the agency adjudications context as it is in the trial context—if the ALJ [Administrative Law Judge] erroneously excludes reliable evidence the agency must either remand for further proceedings or decide the case on the basis of an incomplete record. Second, the risk of errors of exclusion is greater in the agency adjudication context than in the context of a jury trial. Third, there are good reasons to take this risk in the jury trial context that do not exist in the case of agency adjudications.

---

**2.** At oral argument before us, appellant expanded on the argument in his brief by contending that the Legislature, through its inclusion of competency as a criteria for excluding evidence in a trial board proceeding, intended to incorporate common law evidentiary principles in the protections to be afforded police under LEOBR. As this assertion is bereft of support in the legislative history of LEOBR, as conceded by appellant, we find it wholly lacking in persuasive force.

Prompt resolution of difficult evidentiary issues ... presents even greater challenges and risk to agency ALJs than to ... trial judges. To resolve close evidentiary questions, a judge must focus specifically and with some care on the issues in the proceeding and on the relationship between a proffered item of evidence and those issues, for most such questions must be answered by reference to the purpose for which the evidence can be considered and its probative value when considered for that purpose. Yet, agency ALJs often have an incomplete understanding of the issues at the time they must rule on the admissibility of evidence. ALJ's unlike ... judges, do not resolve cases subject only to possible appeal. Rather, they issue initial decisions that are, for most purposes, functionally equivalent to recommendations to agency decision makers. Since the ALJ is not the final decision maker, she often has an imperfect understanding during the hearing of both the issues the agency ultimately will consider important and the probative value the agency will attach to various types of evidence with respect to those issues.

* * *

The decision to take the risk of erroneous exclusion of evidence in jury trials is based in part on considerations of necessity that have no analogue in administrative adjudications. In a jury trial, there is little choice but to ask trial judges to resolve close evidentiary disputes through application of complicated and detailed exclusionary rules, and thereby to take that risk that a new trial or of a decision that is not based on all reliable evidence. In Dean Calabresi's words, juries are 'irresponsible' decision makers in the sense that they are not required to explain the basis for their decisions, including particularly the evidentiary bases for their findings of fact. Thus, if we want to preclude juries from basing findings on evidence considered unreliable by judges, we can do so only by precluding their exposure to that evidence in the first place.

The considerations are entirely different in agency adjudications. Agencies and ALJs are required to state the bases for their findings of fact. Their findings are then subject to judicial review under the substantial evidence standard. If an agency finding is based on unreliable evidence, the agency's action is reversed. Thus, there is a mechanism available in agency adjudications independent of rulings on the admissibility of evidence to insure that agency findings are based only on reliable evidence.

Richard J. Pierce, *Use of the Federal Rules of Evidence in Federal Agency Adjudications*, 39 Admin.L.Rev. 1, 17–19 (1987) (footnotes omitted). *See also*, Kenneth C. Davis, *Hearsay in Administrative Hearings*, 32 Geo.Wash.L.Rev. 689, 693–64 (1962); Kenneth C. Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv.L.Rev. 364, 376 (1942); Arnold Rochvarg, *Hearsay in State Administrative Hearings: The Maryland Experience and Suggestions for Change*, 21 U.Balt.L.Rev. 1 (1991); Note, *Hearsay—Admissibility before Administrative Boards*, 37 Yale L.J. 993, 994 (1927). Of course, occasionally, even in modern administrative process, the administrative hearing body may not be presided over by a legally-trained ALJ, e.g., the police trial board. Thus, the rules of evidence in administrative proceedings generally are designed not to be thickets of common law brambles requiring a Juris Doctor guide. They are intended, instead, to be understandable and readily useable by the average citizen.

■■ Nonetheless, while administrative agencies are not constrained by technical rules of evidence, they must observe basic rules of fairness as to the parties appearing before them so as to comport with the requirements of procedural due process afforded by the Fourteenth Amendment. *See* Md. Code Ann., State Gov't § 10–222(h)(3)(i); *Schultz v. Pritts*, 291 Md. 1, 7, 432 A.2d 1319 (1981). The Court has remained steadfast in reminding agencies that to be admissible in an adjudicative proceeding, hearsay evidence must demonstrate sufficient reliability and probative value to satisfy the requirements of procedural due process. *See Department of Public*

*Safety & Correctional Servs. v. Cole*, 342 Md. 12, 32, 672 A.2d 1115 (1996); *Motor Vehicle Admin. v. Karwacki*, 340 Md. 271, 285, 666 A.2d 511 (1995) (holding that criteria of reliability is applicable to hearsay evidence).[3] Indeed, hearsay statements are admissible in an administrative proceeding and if found to be credible and probative, may form the sole basis for the agency's decision. *Redding v. Board of County Com'rs for Prince George's County*, 263 Md. 94, 110–11, 282 A.2d 136 (1971), *cert. denied*, 406 U.S. 923, 92 S.Ct. 1791, 32 L.Ed.2d 124 (1972); *Kade v. Charles H. Hickey Sch.*, 80 Md.App. 721, 725, 566 A.2d 148 (1989). Finally, the Court countenances the relaxation of evidentiary rules so long as they are not applied in an arbitrary or oppressive manner that deprives a party of his or her right to a fair hearing. *Commission on Medical Discipline v. Stillman*, 291 Md. 390, 422, 435 A.2d 747 (1981).

■ Appellant, while acknowledging that hearsay evidence may be admissible in administrative proceedings if probative and credible, asserts that the hearsay testimony in the instant case was incompetent. In support of his contention, he cites the following language from *Department of Public Safety and Correctional Servs. v. Scruggs*, 79 Md.App. 312, 556 A.2d 736 (1989):

The critical requirement ... is that whether in judicial or administrative proceedings, the evidence presented must be considered, "competent." We believe that the Legislature clearly has indicated its intent that evidence which would be considered "incompetent", and for that reason inadmissible

---

3. *Carroll v. Knickerbocker Ice Co.*, 218 N.Y. 435, 113 N.E. 507 (1916), is generally considered to be the first major case dealing with hearsay evidence in administrative proceedings. The first Maryland case to address hearsay evidence in the context of administrative proceedings is *Standard Oil Co. v. Mealey*, 147 Md. 249, 127 A. 850 (1925). In *Mealey*, it was alleged that Mr. Mealey's leukemia condition was aggravated by an accidental injury suffered during the course of his employment. His widow, building superintendent, and three doctors who had treated him just before his death testified that Mealy had told each of them he had slipped and hit his left side at work. *Id.* at 251–52, 127 A. at 851. The Court held that the hearsay evidence was admissible before the Workmen's Compensation Commission as long as there is an "assurance of reliability." *Id.* at 254, 127 A. at 851.

for substantive purposes in judicial proceedings, should also be excluded in proceedings before administrative agencies. *Id.* at 322, 556 A.2d 736. Appellant, however, fails to recognize that it is not the hearsay nature of proffered evidence that is determinative of whether such evidence is admissible. Instead, as our analysis of the Court of Appeals's jurisprudence on this issue indicates, the evidence's probative value, reliability, and fairness of its utilization are the principal factors considered in the competency analysis.

In the instant appeal, appellant has not articulated how the statements made by Ms. Nelson to the officers were incompetent or unreliable except for his bald assertion that he was denied the opportunity to cross-examine Ms. Nelson. Nor has appellant demonstrated how the Board's decision to consider Ms. Nelson's hearsay statements was arbitrary or oppressive. Nevertheless, in the interests of ensuring that appellant's due process rights remain untrammelled we shall proceed with our own independent analysis.

 It is improper for an agency to consider hearsay evidence without first carefully considering its reliability and probative value. One important consideration for a hearing body is the nature of the hearsay evidence. For instance, statements that are sworn under oath, *see Kade,* 80 Md.App. at 726, 566 A.2d at 151, *Eichberg v. Maryland Bd. of Pharmacy,* 50 Md.App. 189, 194, 436 A.2d 525, 529 (1981), or made close in time to the incident, *see Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 1427–28, 28 L.Ed.2d 842 (1971), or corroborated, *see Consolidated Edison v. N.L.R.B,* 305 U.S. 197, 230, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938) ("mere uncorroborated hearsay or rumor does not constitute substantial evidence"); *Wallace v. District Unemployment Compensation Bd.,* 294 A.2d 177, 179 (D.C.App.1972), ordinarily is presumed to possess a greater caliber of reliability. In the case at bar, Ms. Nelson's statements were not sworn. Nonetheless, although not sworn, Ms. Nelson's comments to the officers, if made with knowledge of their falsehood, with an intent to deceive the investigating officer, and with an intent

to cause an investigation or other similar action to be taken as a result of the lie, could have subjected her to criminal penalties. *See* Md.Ann.Code, art. 27 § 150 (criminalizing false statements to police officers); *Johnson v. State,* 75 Md.App. 621, 634, 542 A.2d 429 (1988), *cert. denied,* 316 Md. 675, 561 A.2d 215 (1989). Furthermore, a relatively short period elapsed from the point of the alleged incident until the time Ms. Nelson recounted her story to Officer Moore and Lieutenant Henderson. Appellant testified that Ms. Nelson entered the apartment at approximately 3:30 a.m. Officer Moore testified that he received a call to respond to an incident at Ms. Nelson's residence at 3:51 a.m. on the night in question. Lieutenant Henderson testified that his encounter with appellant occurred "[a]pproximately close to 4:00 a.m." Thus, while Ms. Nelson's statements might not constitute an "excited utterance", *see* Md.Rule 5–803(b)(2), their relative proximity in time to the allegedly heated incident is a factor that enhances the reliability of her statement. *Cf. Dennis v. State,* 105 Md.App. 687, 699–700, 661 A.2d 175, *cert. denied* 340 Md. 500, 667 A.2d 341 (1995) (concluding that statement to police was excited utterance when it was made approximately twenty minutes after declarant called police and at time declarant met police officer she was "very upset ... almost to the point where she was hysterical") (Wilner, C.J.). Finally, Ms. Nelson's testimony was corroborated by the fact that Lieutenant Henderson testified to noticing red marks on both sides of Ms. Nelson's neck and that her face was puffy and red. This furnished the board with evidence independent of Ms. Nelson's statements, that refuted appellant's contention that he did not assault, strike, or choke Ms. Nelson, thereby enhancing the reliability of Ms. Nelson's statements as relayed by the Departmental witnesses.

Appellant cites our decision in *Don–Neil Kade v. The Charles H. Hickey Sch.,* 80 Md.App. 721, 566 A.2d 148 (1989) for the proposition that hearsay statements must be competent to be admissible in an administrative proceeding. *Kade* involved allegations of misconduct of a supervisor at a state-operated detention facility. At the hearing before the agency,

the school's superintendent testified as to statements made to him by others concerning Kade's conduct. The superintendent, however, was not present during the alleged incidents. In addition, a report by the employee who was allegedly on the receiving end of Kade's improprieties and other written statements of students who had allegedly witnessed the incident were admitted into evidence. *Id.* at 724–26, 566 A.2d at 149–51. In reversing the Department of Personnel's decision to suspend Kade, we held as follows:

> Under the circumstances of the instant case, we hold that DOP [Department of Personnel] improperly based its decision to affirm appellant's suspension on the written statements of his co-workers and the students at the Charles H. Hickey School. Even though the statements were relevant, there was no indication that this hearsay evidence was reliable, credible or competent. The statements which were submitted by appellant's co-workers are not under oath and do not reflect how they were obtained. Similarly, the statements submitted by the students are not sworn or dated, and they do not give any indication of the circumstances under which they were given. Furthermore, there was no evidence that the students were competent witnesses to the incident which gave rise to appellant's suspension.
>
> \* \* \*
>
> Credibility was critical in making a determination of whether appellant was guilty of misconduct. . . . Appellant's version of what occurred that evening was diametrically opposed to the version set forth in the written statement on which DOP based its decision. . . . DOP's hearing officer had no basis for evaluating the credibility of the declarant of the written statements on which she based her proposed order. . . . Without that ability appellant's right to a fair hearing on the allegations of the appellees was compromised.

*Id.* at 726–27, 566 A.2d at 151. Thus, our decision in *Kade* makes clear that notions of fairness impose limits on the use of

hearsay in administrative proceedings. *Id.* at 725, 566 A.2d at 150.

Appellee retorts by noting several differences between the evidence presented in *Kade* and the instant matter that underscore why the hearsay evidence in this case is reliable, and therefore admissible, while the statements in *Kade* were not. In *Kade,* only one live witness testified, through whom the hearsay statements were identified and admitted. Here, Officer Moore's and Lieutenant Henderson's recounting of Ms. Nelson's statements were each consistent with, and supported the testimony of, the other. *See, e.g., Mealey,* 147 Md. at 255, 127 A. at 851 (basing, in part, its holding that hearsay evidence was reliable on the number of witness who testified as to declarant's statements). Second, the hearsay statements in *Kade* did not reflect the circumstances under which they were prepared, while the police report containing Ms. Nelson's statements did. Third, the *Kade* witnesses' statements were not dated or verified nor was there any indication of the witnesses' ages or addresses. No such problems existed in this case. *Id.* at 726, 566 A.2d at 150–51. Additionally, unlike *Kade,* Officer Moore and Lieutenant Richardson were able to corroborate Ms. Nelson's statements by witnessing the location and extent of her injuries themselves and by conducting an official investigation soon after the alleged battery. Finally, the *Kade* Court noted that hearsay statements are properly considered when there is *someone* who could be examined as to when, where, and how the hearsay statements were made. *Id.* at 728, 566 A.2d at 151–52. Based on our own comparison of the pertinent facts of *Kade* with those in the instant matter, we conclude that appellant's reliance on *Kade* is unavailing because the hearsay statements in the instant suit possessed a greater quantum of reliability, and were therefore not inadmissible on incompetency grounds.

We would be remiss in our analysis if we failed to consider the Court of Appeals's admonition that administrative agencies must observe basic rules of fairness as to the parties before them. *Fairchild Hiller Corp. v. Supervisor of Assessments,* 267 Md. 519, 523, 298 A.2d 148 (1973). We have

recognized that a basic tenet of fairness in administrative adjudications is the requirement of an opportunity for reasonable cross-examination. *American Radio–Telephone Service, Inc. v. Public Serv. Comm'n,* 33 Md.App. 423, 434, 365 A.2d 314, 320 (1976). There, we concluded that it was error to admit two affidavits because the affiants were not available for cross-examination. Further, in *Tron v. Prince George's County,* 69 Md.App. 256, 517 A.2d 113 (1986), the County, in order to dispute a disability claim, introduced the written reports of three physicians who had examined Tron and the testimony of a doctor who examined those reports and concluded that the disability was not work-related. Once again, we recognized that "a reasonable right of cross examination must be allowed," in an administrative adjudicatory proceeding by statute and case law. *Id.* at 261, 517 A.2d at 116 (quoting *Hyson v. Montgomery County Council,* 242 Md. 55, 67, 217 A.2d 578, 585 (1966)). Accordingly, we concluded that Tron's right to a fair hearing had been denied because "the opportunity to cross-examine witnesses is a requirement of administrative adjudicatory hearings ... [and b]ecause no live witnesses were produced." *Id.* at 263, 517 A.2d at 117.

In the case at bar, Ms. Nelson was the target of appellant's alleged misconduct in the pertinent charges. Ordinarily, a complaining witness who is also a "victim" cannot be viewed as neutral and detached. Such concerns are less weighty in cases when hearsay statements come into evidence through a disinterested witness because they tend to be more reliable than statements introduced through a witness who has an interest in the subject matter underlying the controversy. *Dembeck v. Bethlehem Shipbuilding Corp.,* 166 Md. 21, 28, 170 A. 158, 160 (1934); *see Bethlehem Steel Co. v. Traylor,* 158 Md. 116, 148 A. 246 (1930). Thus, there is some force behind appellant's argument that in a hearing to determine whether he would be permitted to retain his livelihood, due process requires that he be accorded the opportunity to cross-examine a complaining witness. *Cf. Maryland Dept. of Human Resources v. Bo Peep Day Nursery,* 317 Md. 573, 600, 565 A.2d

1015, 1028–29 (1989), *cert. denied,* 494 U.S. 1067, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990).

 Nonetheless, because appellant failed to exercise his right to subpoena Ms. Nelson, *see* Md.Ann.Code, art. 27 § 730(j),[4] we conclude that he has effectively waived his right to complain about a denial of the opportunity to cross-examine Ms. Nelson.[5] In 1971, the Supreme Court in *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), upheld the admission of hearsay evidence in a proceeding before the Social Security Board, noting that Perales's lawyer could have subpoenaed the hearsay declarant but did not do so. *Id.* at 404–05, 91 S.Ct. at 1428–29. Although not citing *Perales,* we held in *American Radio–Telephone* that the error in admitting affidavits, without subjecting the affiant to cross-examination, was harmless because the opponents "made no request for ... an opportunity to bring the affiant in for cross-examination." 33 Md.App. at 435, 365 A.2d at 320. Finally, in *Tron,* we distinguished *Perales* on the ground that Tron had not been furnished with subpoena power, while the claimant in *Perales* failed to exercise his right under the Social Security Act to subpoena adverse witnesses. We read *Perales* as standing for the proposition that claimants who forgo their right to subpoena known, material witnesses effectively waive

---

4. The relevant portion of section 730(j) reads as follows:

 *Summonses.*—(1) The chief, or hearing board ... shall in connection with any disciplinary hearing have the power to ... issue summonses to compel the attendance and testimony of witnesses.... Any party may request the chief or hearing board to issue a summons or order under the provisions of this subtitle.

 (2) In case of disobedience or refusal to obey any of these summonses, the chief, or hearing board, may apply to the circuit court ... for an order requiring the attendance and testimony of the witness ..., without cost. Upon a finding that the attendance and testimony of the witness .... is relevant or necessary, the court may issue an order requiring the attendance ... without cost, and any failure to obey an order of the court may be punished by the court as a contempt thereof.

5. The record indicates that it was not impossible for appellant to locate Ms. Nelson in light of the fact that he had spoken with her at least once since the alleged incident.

any objections to denial of an opportunity to cross-examine. 69 Md.App. at 264, 517 A.2d at 117. *Accord Changing Point, Inc. v. Maryland Health Resources Planning Comm'n,* 87 Md.App. 150, 172, 589 A.2d 502 (1991); *but cf. Kade,* 80 Md.App. at 726, 566 A.2d at 151 (concluding that hearsay was reliable based on the fact that hearsay proponent did not subpoena declarant). We conclude that, in light of appellant's failure to subpoena Ms. Nelson, the admission of her statements to Officer Moore and Lieutenant Henderson did not vitiate appellant's right to a fair administrative hearing.

*II.*

Appellant's other contention is that the board's decision to recommend termination was not supported by substantial evidence. In particular, he contends that, based on the evidence presented at the hearing, it was unreasonable for the board to conclude that he was insubordinate or that he disobeyed the lawful command or order of a superior officer.

 Under Section 10–222(h)(3)(v) of the APA, a reviewing court may reverse or modify an agency decision if a substantial right has been prejudiced because a finding is unsupported by competent, material, and substantial evidence in light of the entire record as submitted. *See Anderson v. Department of Public Safety and Correctional Servs.,* 330 Md. 187, 215, 623 A.2d 198 (1993); *Strother v. Board of Educ.,* 96 Md.App. 99, 108, 623 A.2d 717 (1993). In reviewing an agency's factual findings, we therefore apply the "substantial evidence" test to the final decisions of an administrative agency. *Erb v. Maryland Dept. of Environment,* 110 Md. App. 246, 256, 676 A.2d 1017 (1996); *Meyers v. Montgomery County Police Dept.,* 96 Md.App. 668, 708, 626 A.2d 1010 (1993) (substantial evidence test applied in reviewing LEOBR proceedings). Under the substantial evidence standard, a reviewing court must uphold an agency's determination if it is rationally supported by the evidence in the record, even if the reviewing court, left to its own judgment, might have reached a different result. *Department of Economic and Employment Dev. v. Lilley,* 106 Md.App. 744, 754, 666 A.2d 921 (1995).

When a reviewing court examines the manner in which an agency applied law to facts, which is a judgmental process involving a mixed question of law and fact, great deference must be accorded to the agency. *Gray v. Anne Arundel County*, 73 Md.App. 301, 309, 533 A.2d 1325 (1987). Accordingly, the test of appellate review of an administrative agency is whether a reasoning mind could have reached the factual conclusion that the agency reached, consistent with the proper application of controlling legal principles. *See Motor Vehicle Admin. v. Lindsay*, 309 Md. 557, 564, 525 A.2d 1051 (1987); *Baltimore Bldg. and Const. Trades Council AFL–CIO v. Barnes*, 290 Md. 9, 17, 427 A.2d 979 (1981); *Umerley v. People's Counsel for Baltimore County*, 108 Md.App. 497, 503, 672 A.2d 173, *cert. denied*, 342 Md. 584, 678 A.2d 1049 (1996) (citation omitted). Our review of an administrative agency's factual findings entails only an appraisal and evaluation of the agency's fact-finding and is not an independent decision on the evidence. Further, we may not substitute our judgment for that of the agency concerning the appropriate inferences to be drawn from the evidence. *Erb*, 110 Md.App. at 256–57, 676 A.2d 1017 (1996). On the other hand, a reviewing court may substitute its judgment on law for that of the agency if the factual findings supported by substantial evidence are susceptible of but one legal conclusion, and the agency does not so conclude. *Westinghouse Elec. Corp. v. Callahan*, 105 Md.App. 25, 34, 658 A.2d 1112 (1995).

In *Commissioner, Baltimore City Police Dep't v. Cason*, 34 Md.App. 487, 368 A.2d 1067, *cert. denied*, 280 Md. 728 (1977), we summarized the scope of review concerning an agency's factual determinations as follows:

(1) A reviewing court may, and should, examine any inference, drawn by an agency, of the existence of a fact not shown by direct proof, to see if that inference reasonably follows from other facts which are shown by direct proof. If it does, even though the agency might reasonably have drawn a different inference, the court has no power to disagree with the fact so inferred.

(2) A reviewing court may, and should, examine any conclusion reached by an agency, to see whether reasoning minds could reasonably reach that conclusion from facts in the record before the agency, by direct proof, or by possible inference. If the conclusion could be so reached, then it is based upon substantial evidence, and the court has no power to reject that conclusion.

(3) A reviewing court may, and should, examine facts found by an agency, to see if there was evidence to support each fact found. If there was evidence of the fact in the record before the agency, no matter how conflicting, or how questionable the credibility of the source of the evidence, the court has no power to substitute its assessment of credibility for that made by the agency, and by doing so, reject the fact.

*Id.* at 508, 368 A.2d 1067.

This Court's viewpoint was echoed by the Court of Appeals one year later in *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 390 A.2d 1119 (1978). The *Bulluck* Court defined "substantial evidence" as

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

\* \* \*

[Our review is limited] to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached....

\* \* \*

[In applying the substantial evidence test] a court should [not] substitute its judgment for the expertise of those persons who constitute the administrative agency from which the appeal was taken.[6]

---

**6.** *See* Md.Code Ann., State Gov't § 10–213(i) (noting that agencies may rely on "its experience, technical competence, and specialized knowledge in the evaluation of evidence").

[D]ecisions of administrative agencies are prima facie correct [and] carry with them the presumption of validity

*Id.* at 512–13, 390 A.2d 1119 (internal citations omitted).

 Appellant contends that there is nothing in the record that would indicate that the rules and regulations he allegedly violated apply to off-duty police officers. This contention bespeaks appellant's failure to appreciate the applicability of the rules and regulations governing members of the Baltimore City Police Department. General Order 2–88, promulgated 24 June 1988, contains the following Policy Statement:

> Rules and Regulations are necessary for the achievement of organizational goals. Primary among these goals is a requirement that all members of the department adopt a general standard of conduct *on and off-duty* consistent with the professional standards of the law enforcement community.

(emphasis added).

Rule 1 of General Order 2–88 provides that any misconduct *either within or without Baltimore City,* subjects a member of the department to disciplinary action by the Commissioner. *See also* Rule 1, Section 1 ("All members of the department shall be ... quiet, civil and orderly *at all times* ...") (emphasis added). Finally, Rule 1, Section 13 provides that "[n]o member of the department *shall at any time* be insubordinate or disrespectful to a superior." (emphasis added). The regulations make no distinction between officer misconduct occurring either on or off-duty. Instead, the rules and regulations contained within General Order 2–88 were undoubtedly designed to apply to members of the Baltimore City Police Department regardless of whether they are on duty. *See Beeler v. Behan,* 55 Md.App. 517, 525, 464 A.2d 1091, *cert. denied,* 298 Md. 243, 469 A.2d 452 (1983) (holding that police officer could be disciplined for violating police department regulation prohibiting public criticism or ridicule of official action even though police officer's remarks were made while he was off-duty).

■ Turning to the insubordination charge, we conclude that sufficient evidence was presented at the hearing to sustain a guilty finding on that charge. Lieutenant Henderson testified, albeit in somewhat conclusionary fashion, that appellant "showed absolutely no cooperation whatsoever," his attitude was "very antagonistic ... [n]o professionalism what-so-ever [sic]," and that he was "abrupt" and "verbally uncoopera-tive" during the investigation, despite the fact that Lieutenant Henderson was dressed in full uniform. Such evidence rea-sonably led the board to conclude that appellant's failure to accord the proper respect to a fully uniformed superior officer rose to the level of insubordination as contemplated by Rule 1, Section 13. Mindful of the board's expertise in determining what conduct undermines the Department's interest in "good order, efficiency, or discipline" we shall not disturb the board's conclusions concerning Charge 1 and Charge 4, Specification 1 (insubordination toward Lieutenant Henderson).[7]

Appellant also objects to the board's finding that he dis-obeyed a lawful order or command. Essentially, appellant claims that no evidence was introduced before the hearing board indicating that Lieutenant Henderson actually ordered him to leave the apartment. Appellee seeks to justify the Board's finding as to this charge by pointing out that Lieuten-ant Henderson tried to make his wishes known "as strong as possible." To analyze properly this contention we examine the following portion of the hearing transcript:

[LIEUTENANT HENDERSON]: ... I *advised* [appel-lant] that Northern District was a profile district for domes-tic violence, *our ... main policy is that of arrest and given that would he leave the apartment* and he said no. I said, "Well, let's try this—" I said, "How many years do you have

---

7. We note in passing that appellant's demeanor while testifying at the hearing did not aid his cause in refuting the insubordination charge. For instance, appellant begrudgingly acknowledged that, at the time of the alleged incident, Lieutenant Henderson was his superior. Further, the Chairperson of the trial board, on at lest one occasion, admonished appellant to accord the proper decorum and deference to the proceed-ings.

on the department," thinking maybe he was new. He told me I think eight years. I said, Well, then you've got enough time on to realize right now you may be suspension of powers [sic] and having you ... take this up with your major Monday morning or placing you under arrest for domestic assault. I said, bearing that in mind, *will you leave?* And he tells me No, her mother lives around the corner. She can leave. And that when I told him *that was not one of his options.*

\* \* \*

Well, I talked to Ms. Nelson.... I said, "Do you want him arrested," and she said, "No, I just want him to leave."

\* \* \*

So when I told Travers again, I said, "With that in mind, *do you want to leave the apartment,*" and he said, "No." There was absolutely no cooperation whatsoever. At this time I turned around to Ms. Nelson and I ... said, "Let me put it this way, Ms. Nelson ... [d]o you fear for your safety if I leave this man in this apartment," and she said, "Yes, I do."

\* \* \*

So therefore I said, "Okay." She said she'd probably just have him leave, he refused to do that and I said, "Well, then with that in mind," I said, "*You going to leave? I never actually ordered him to leave the apartment. I tried to make it as strong as possible—and he refused.* At that time I told him he was under arrest for domestic violence assault....

\* \* \*

[ASSISTANT SOLICITOR]: Now, you said that you never actually ordered him to leave?

A: No, sir, I did not.

Q: But did you make it clear to him that it was in his best interests to leave?

A: I made it clear to him several times he should leave. And even I told him, I said, "If you don't leave you could be placed under arrest." . . .

Q: You tried to work with him, in other words?

A: Yes, I did.

(emphasis added).

 Generally, it is recognized elsewhere that an "order" is a mandate or precept, or a command or direction authoritatively given. *Brady v. Interstate Commerce Comm'n*, 43 F.2d 847, 850 (D.C.W.Va.1930); *Bankers Fire & Marine Ins. Co. v. Bukacek*, 271 Ala. 182, 123 So.2d 157, 165 (1960). In the context of the United States military, an "order" is a communication that tells a service person receiving the order what to do or what not to do. *United States v. McLaughlin*, 14 M.J. 908, 910 (N.M.C.M.R.1982). To be characterized as an "order," a communication must amount to a "positive command." *United States v. Warren*, 13 M.J. 160, 161 (C.M.A 1982).

 In the Armed Forces, the sanctions for disobedience of an order can be severe. Thus, the recipient of an order must be placed on notice that the proponent of the order is bringing his or her authority to bear in order to compel compliance. If such notice is given, the recipient should be well aware that by noncompliance, he subjects himself to severe punishment. *Warren, supra.*

 Nonetheless, it is understood that a communication need not be expressed in peremptory form to constitute an order, but rather may be expressed in a courteous form. *McLaughlin, supra.* We recognize that there must be significant flexibility in the form orders may take so as to balance the competing interests of discipline, high morale, and good order. Similarly, we are cognizant of the fact that "orders" are often given in "toned-down" form when the recipient is under great emotional stress. *See id.* at 910. The aforemen-

tioned notwithstanding, such orders must leave no doubt that its proponent intended that his or her order be obeyed. *See id.* at 910–11. Statements that are meant to be orders must not lack specificity of meaning, cannot be mere statements of wishes or views, nor can they be merely advisory. *Id.* at 911.

An analogous construction to "order" has been applied in the context of disciplinary proceedings arising within a civilian police force. In *Cheney v. City of Somersworth*, 122 N.H. 130, 441 A.2d 1172, 1173 (1982), the court held that an "order" which when disobeyed is sufficient cause for dismissal from a police department, is a command or direction authoritatively given and encompasses commands, instructions, and directions emanating from a superior which directs or requests a subordinate's action. It is not a suggestion or request but a command which leaves no room for exercising of discretion.

In the case at bar, our review of the record failed to uncover evidence that Lieutenant Henderson ordered appellant to leave the apartment. First, Lieutenant Henderson testified under both direct and cross-examination that he never ordered appellant to leave the apartment. Instead, he advised appellant that it was in his best interest to leave. Although he sought to make his desires "as strong as possible", Lieutenant Henderson's statements were merely precatory and not commands or orders. Further, his statements gave appellant a choice: leave the apartment or be arrested for domestic assault. Thus, appellant had the discretion to abide with Lieutenant Henderson's wishes and leave the apartment on his own or be arrested.[8] Finally, there is no indication that Lieutenant Henderson was bringing his authority as a superior officer to bear in order to secure appellant's compliance. On the contrary, the interaction between Henderson and appellant was more akin to police officer and alleged domestic abuser rather than Lieutenant to police

---

8. Appellee has not made us aware of any provision in the Baltimore City Police Department rules and regulations in which a police officer can be subjected to immediate incarceration for simply failing to follow a superior's order or command.

officer. Accordingly, we conclude the record is bereft of substantial evidence such that reasonable minds could conclude that appellant failed to obey a command or order of a superior officer (Charge 2, Specification 1 and Charge 4, Specification 2).

## CONCLUSION

Because the board's conclusions as to two specifications were not supported by substantial evidence, we shall vacate the judgment of the circuit court and instruct it to remand this case to the Baltimore City Police Department. As the remainder of the board's conclusions are affirmed, the Department need not conduct a new evidentiary hearing. Instead, the Department shall reconsider what action, if any, it will take against appellant, considering only those conclusions that we have affirmed. We are compelled to direct this remand because appellee's decision to terminate appellant's employment was predicated facially on the collective charges against appellant. For us to assess whether appellee would have fired appellant on only those charges and specifications we here sustain would usurp the administrative agency's prerogative and administrative expertise.

Lest there be any confusion, however, our decision in this matter does not reflect this Court's view as to the propriety of the board's recommendation or the Police Commissioner's ultimate Order to discharge appellant. Instead, we merely conclude that insufficient evidence was adduced at the hearing to support a reasonable conclusion that appellant violated the order or command of a superior and, therefore, appellee must decide what action to take against appellant on the remaining affirmed charges. Finally, our decision in this matter does not compel the reinstatement of appellant's employment pending the board's recommendation and the Commissioner's ultimate decision.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED WITH INSTRUCTIONS TO REMAND THIS CASE TO THE BALTIMORE CITY POLICE

# 428

DEPARTMENT FOR FURTHER PROCEEDINGS CON-
SISTENT WITH THIS OPINION; COSTS, IN OUR DIS-
CRETION, TO BE DIVIDED EVENLY BETWEEN AP-
PELLANT AND APPELLEE.