873 A.2d 1201

**Percy W. DARDEN**

v.

**MASS TRANSIT ADMINISTRATION et al.**

**Nos. 0032 & 0033, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

May 4, 2005.

232

Allan Heneson of Baltimore, for appellant.

James A. Haynes of Towson, MD. & Ellen D. Jones (J. Joseph Curran, Jr., Attorney General on the brief), of Baltimore, for appellee.

Argued before KENNEY, ADKINS, CHARLES E., MOYLAN, JR. (retired, specially assigned), JJ.

MOYLAN, Judge.

In the context of Workers' Compensation law, a subsequent injury on the heels of a prior partial disability sometimes creates the arithmetic anomaly of the whole being greater than the sum of its parts. In this appeal, that anomaly poses the question of whether the subsequent employer, in such a case, is responsible for the whole or only for a particular part. Is the responsibility of the employer in any way altered, moreover, if the subsequent employer happens to have been, coincidentally, the earlier employer as well? To the problem of who picks up the tab for the difference when the whole is greater than the sum of its parts, Maryland responded 1) by creating, in 1963, the Subsequent Injury Fund; and 2) by forging, in the intervening 42 years, an entire body of implementing jurisprudence.

Our most daunting challenge will be to unravel, almost surgically, two discrete strands of litigation that became hopelessly intertwined. Two work-related injuries occurred, over four years apart. They could have been litigated four years apart. Seeds of confusion were sown, however, when the respective claims 1) were simultaneously heard and decided by the Workers' Compensation Commission, 2) were simultaneously appealed to the circuit court, 3) were simultaneously remanded to the Commission, 4) were simultaneously appealed to the circuit court for a second time, and 5) are now simultaneously appealed to us. Compounding the confusion is the coincidental fact that the employer at the time of the subsequent injury also happened to have been the employer at the

time of the earlier injury. Under the circumstances, a fusion amounting to symbiosis was inevitable.

Our challenge will be to sort out discrete juridical events and then to make every effort to see that our analysis of one does not leak into the analysis of the other. If the two compensation claims had been litigated sequentially instead of simultaneously, this case would have been delightfully simple. Our goal will be to assess the two claims as if they had been litigated sequentially.

## Two Sequential Injuries

It behooves us to establish, first, a proper calendar of relevant events. What matters in that regard is the chronology of the injuries, not the chronology of the litigation of the injury claims. At all times pertinent to this case, the appellant, Percy W. Darden, was employed by the appellee, Mass Transit Administration ("MTA"), as a heavy rail operator. In both 1994 and 1998, Darden suffered work-related injuries. On both occasions he filed claims with the Workers' Compensation Commission and on both occasions the Commission made awards in his favor. There is no dispute with respect to the merits of Darden's claims for compensation. The only dispute concerns the proper method for calculating the total compensation ultimately due him.

The first injury occurred on January 18, 1994, when Darden slipped on the ice and fell on the right side of his body at the Wabash Avenue rail yard in Baltimore. He suffered multiple injuries and, as a result of those injuries, underwent 1) bilateral carpal tunnel surgery, 2) right trigger thumb surgery, and 3) right rotator cuff surgery. Darden filed a claim, No. B307805, with the Commission on what appears to have been March 7, 1994.

The second work-related injury occurred four years later, on July 9, 1998, when Darden suffered an injury to his left knee while climbing into a subway train cab in order to re-qualify as a train operator after his right shoulder surgery. As a result of that later injury, he underwent left knee

surgery. For that accident in 1998, Darden filed a claim, No. 481077, with the Commission, apparently on November 24, 1999.

## Simultaneous Litigation Before the Commission
## Of the Two Distinct Claims

For whatever reason, the claim for the 1994 injury and the claim for the 1998 injury were both brought before the Commission for hearings on the same date, April 1, 2002. The Commission, however, carefully rendered separate decisions in the two cases. In its Order of April 17, 2002, the Commission found that as a result of the 1994 injury Darden had sustained:

> 55% under "Other Cases" industrial loss of use of the body as a result of the accidental injury, 43% of said accidental injury is reasonably attributable to the accidental injury to the left shoulder (25 weeks), right shoulder (100 weeks), left upper arm (30 weeks), right upper arm (45 weeks), left thumb (3 weeks) and right thumb (7 weeks), and 12% thereof is due to the pre-existing condition to the back, right knee, headaches, and pulmonary.

The Commission also found:

> That the disability to the claimant's left shoulder is causally related to the accidental injury. *The Claimant is not permanently totally disabled.*

(Emphasis supplied).

The relief awarded was as follows:

> The Commission finds that the overall disability of the claimant does exceed 50% of the body as a whole and that the portion due to the pre-existing condition does not amount to the 125 weeks of disability benefits, *the Subsequent Injury Fund is not liable at this time.*
>
> It is, therefore, this 17th day of April, 2002, by the Workers' Compensation Commission ORDERED that the compensation for temporary total disability terminate on June 11, 2002 inclusive; and further ORDERED that the above-named employer and above-named insurer *pay unto the above-named claimant, compensation for permanent*

*partial disability* at the rate of $170.00, payable weekly, beginning June 12, 1999 for a period of 215 weeks.

(Emphasis supplied).

That award, at a rate of $170 per week for a period of 215 weeks, would have amounted to a payment of $36,550 to the appellant for his 1994 injury. Because the Commission found that 43% of the industrial loss of the use of the appellant's body was directly attributable to the 1994 injury, it arrived at the compensation period of 215 weeks by taking the maximum compensable period of 500 weeks for permanent partial disability under the "Other cases" subsection and multiplying by 43%. Maryland Code, Labor and Employment Article (LE), § 9–627(k)(3).

In a separate order, also filed on April 17, 2002, the Commission found that, as a result of the 1998 injury, Darden had suffered a "15% loss of the left knee." It also found that he was "not permanently totally disabled." The relief awarded for the 1998 injury was as follows:

The Commission finds that as a result of the accidental injury sustained on July 9, 1998 the claimant was paid compensation for temporary total disability from July 12, 1999 to July 5, 2000 inclusive.

The Commission finds that the overall disability of the claimant does not exceed 50% of the body as a whole and *the Subsequent Injury Fund is not liable at this time.*

It is, therefore, this 17th day of April, 2002, by the Workers' Compensation Commission ORDERED that the compensation for temporary total disability terminate on July 5, 2000 inclusive; and further ORDERED that the above-named employer and above-named insurer *pay unto the above-named claimant, compensation for permanent partial disability* at the rate of $94.20, payable weekly, beginning July 6, 2000 for a period of 45 weeks.

(Emphasis supplied).

That award, at a rate of $94.20 per week for a period of 45 weeks, would have amounted to a payment of $4,239 to the appellant for his 1998 injury. Because the Commission found

that Darden had suffered a 15% loss of the use of the left knee, a scheduled member, it arrived at the compensation period of 45 weeks by taking the maximum compensable period of 300 weeks for permanent partial disability based on the loss of the use of a leg and multiplying by 15%. LE § 9–627(d) and (e).

### The First Appeal To the Circuit Court

Darden appealed both awards to the Circuit Court for Baltimore City for *de novo* determinations. See *Board of Education v. Spradlin*, 161 Md.App. 155, 867 A.2d 370 (2005). A problem is that we have nothing except a verdict sheet from that appeal *de novo* and we do not know, therefore, precisely what issues Darden raised before the jury. We may, however, be able to come up with some likely inferences.

The two cases came on for a joint jury trial on March 3, 2003. After a three-day trial, the jury, in its response to the issues submitted to it, made a number of specific findings. On the three key findings, the questions put to the jury by the verdict sheet and the jury's answers to those questions were as follows:

3. Do you find that the Claimant, Percy W. Darden, is permanently and totally disabled as a result of the combination of the January 18, 1994 injury and July 9 1998 injury?

   Yes ✓ No ____

4. What percentage of Percy W. Darden's industrial loss of use of body (permanent total disability) do you find as a result of the January 18, 1994 injury?

   *70%*

5. What percentage of Percy W. Darden's loss of use of leg (permanent total disability) do you find as a result of the July 9, 1998 injury (left knee)?

   *30%*

The jury also found that the percentage of disability "due to pre-existing condition" was "7%," but that the preexisting condition was not and was not likely to be "a hindrance to

claimant's employment." The jury also found that there was no permanent total disability as a result of either claim alone, but that there was a permanent total disability as a result of the combination of the two claims.

As a result of the jury's findings, the trial judge issued the following Order on March 7:

> The above captioned cases having been consolidated and come to trial before a Court and Jury on March 3, 4 and 5, 2003, testimony having been taken, exhibits having been submitted and the jury having answered issues of fact finding that the Claimant/Appellant, *Percy W. Darden, is permanently and totally disabled as set forth in the attached Verdict Sheet.*
>
> It is THEREFORE, this 7th day of March, 2003, by the Circuit Court for Baltimore City, ORDERED, that *Workers' Compensation Claim Nos. B307805 and B481077, be and are hereby reversed and remanded to the Workers' Compensation Commission for Modified Orders consistent with the verdict of the jury.*

(Emphasis supplied).

Darden took no appeal from either the jury findings or the subsequent order of the circuit court. Neither did he move for a new trial or seek a clarification of any alleged ambiguity in either the findings or the court order. Those jury findings are our analytic point of departure in assessing the correctness of the subsequent awards.

### The Remand to the Commission

On remand, the Commission, on June 17, 2003, amended its earlier orders of April 17, 2002. At this point, let it be noted that we attach no significance to the fact that the Commission, both prior to the first appeal and again after the remand, referred to the "loss of the use of the left knee," whereas the circuit court jury had referred to the "loss of the use of the left leg." Section 9–627(d)(v) refers to the loss of a "leg." It does not make finer distinctions between the ankle, the calf, the knee cap, the thigh, etc. The loss of the use of a leg is the loss of the use of a leg, whatever the more particularized

etiology for that loss might have been. Whenever the Commission writes "knee," therefore, we shall, without qualm or hesitation, read "leg."

In terms of the ultimate awards, the Commission rendered separate decisions in the two cases. In Claim No. B307805, dealing with the 1994 injury, the Commission took as its point of analytic departure the jury's finding, as the Commission recited:

> The claimant is permanently totally disabled as a result of the combination of the January 18, 1994 and July 9, 1998 injury. 70% of said disability is the result of the January 18, 1994 injury and 30% thereof is due to the July 9, 1998 injury to the left knee and 7% thereof is due to pre-existing conditions.

In disposing of the 7% of the disability "due to pre-existing conditions," thereby relieving us of the daunting prospect of dealing rationally with a computation that adds up to 107%, the Commission ruled that the Subsequent Injury Fund was not involved.

> The Commission finds that the overall disability of the claimant does exceed 50% of the body as a whole and that the portion due to the pre-existing condition does not amount to the 125 weeks of disability benefits, *the Subsequent Injury Fund is not liable at this time.*

(Emphasis supplied).

The award in Case No. B307805, dealing with the 1994 injury, then ordered:

> [T]he above-named employer and above-named insurer pay unto the above-named claimant, compensation for permanent total disability at the rate of $510.00, payable weekly, beginning June 12, 2002 *not to exceed the sum of $178,478.00 allowed under "70% under Other Cases"*, subject to a credit for monies paid under the Order dated April 17, 2002.

(Emphasis supplied).

The Commission then turned to Case No. B481077, dealing with the 1998 injury. Whereas the original order of the

Commission (April 17, 2002) had found that Darden had suffered a "15% loss of the left knee," the Commission interpreted the jury verdict of March 5, 2003, as one raising the percentage of loss of the scheduled member from 15% to 30%. Consequently, its award in that case was:

An Appeal was filed in the above entitled claim in the Circuit Court for Baltimore City and as a result thereof, it is, therefore, this 17th day of June, 2003 by the Workers' Compensation Commission ORDERED that the Order of this Commission dated April 17, 2003 is hereby AMENDED in accordance with the decision of the Court as follows:

2. *PERMANENT PARTIAL DISABILITY: The claimant is not permanently totally disabled as a result of this injury. 30% loss of use of the left knee;* at the rate of $191.00, payable weekly, beginning July 6, 2000, for a period of 90 weeks, subject to a credit for benefits paid under the Order dated April 17, 2002.

(Emphasis supplied).

Whereas the Commission's original award had been for 45 weeks of compensation, based on 15% of 300 weeks, the Commission's recalibrated award of 90 weeks of compensation was based on 30% of 300 weeks. LE § 9–627(d) and (e).

### A Motion for Reconsideration And Its Denial

Aggrieved that the award for the 1998 injury was calculated on the basis of a 30% permanent loss of the use of his left knee (or left leg), rather than on the basis of a 30% loss of his body as a whole, Darden moved for a rehearing. The Commission conducted a hearing on October 22, 2003. It continued to treat the two claims as separate and distinct. On October 27, it issued two separate orders. Each order recited:

Hearing was held (no testimony taken) in the above claim at Baltimore, Maryland, on October 22, 2003 on the employer and insurer's and claimant's Motion for Rehearing.

The Commission, having granted the Employer and Insurer's and Claimant's Motion for Rehearing, will affirm its Order dated June 17, 2003.

It is, therefore, this 27th day of October, 2003, by the Workers' Compensation Commission ORDERED that the Order of this Commission dated June 17, 2003, be and the same is hereby affirmed.

## The Second Appeal To the Circuit Court

On November 5, 2003, Darden filed with the Circuit Court for Baltimore City two separate but substantively identical appeals from the two Decisions and Orders of the Commission. The MTA filed two substantively identical responses. On February 17, 2004, the court ordered the two cases to be consolidated. Prior to the consolidation, Darden had already, on January 7, 2004, moved for summary judgment in his favor. The court conducted a hearing on the motion for summary judgment on February 13, 2004. It subsequently issued a Memorandum Opinion and Order on February 26, affirming the orders of the Commission. After summarizing the procedural background of the case and the arguments of the two parties, the court concluded:

All parties contend that the case of *SIF v. Compton,* 28 Md.App. 526, 346 A.2d 475, affirmed in *Anchor Motor Freight, Inc. v. Subsequent Injury Fund,* 278 Md. 320, 363 A.2d 505 (1976) provides support for their respective positions.

After review of the holdings in *Compton* and *Anchor Motor Freight* the Court is satisfied that the Orders of the Commission apply the correct principles of law and that its findings contained therein are supported by substantial evidence. *Travers v. Baltimore Police Dept.,* 115 Md.App. 395, 419, 693 A.2d 378 (1997).

## A Row of Fallen Dominoes

We shall reverse the circuit court's order affirming the October 27, 2003, orders of the Commission. To explain that reversal at the end of the litigational chain, however, we need to look back to the earliest falling of the first domino, the precipitating event that set a series of errors in irrevocable motion. The circuit court was in error on February 26, 2004,

because the Commission had been in error on October 27, 2003, just as the Commission had earlier been in error on June 17, 2003. At least part of the reason for the Commission's error was the ambiguity of one of the jury's responses of March 5, 2003, which, in turn, was a product of the ambiguous wording of one of the issues submitted to the jury. Contributing to the risk of ambiguity in the jury's findings, moreover, was the ill-advised decision of Darden to take an appeal *de novo* in the first place from the compensation award for his 1994 injury, an award with which he had no apparent quarrel. It was in major measure that ill-advised appeal *de novo* that set off a chain reaction of escalating error.

## Reduced to Fundamentals, This Is a Routine Subsequent Injury Case

Quite aside from any question of whether the Subsequent Injury Fund itself is involved, which we will be discussing further, this should have been a routine subsequent injury case. If at first glance it is difficult to conceptualize the case in those simple terms, it is only because, although the two injuries were sequential, the two claims were litigated simultaneously, essentially as a single package. It becomes more difficult to visualize the true sequence of events when everything seems to be happening at the same time.

In the usual subsequent injury case, there is a discrete sequencing gap between 1) the earlier disability and 2) the subsequent injury. The earlier disability may have been, on the one hand, a physical or medical condition that had no connection with the Workers' Compensation Commission. *Subsequent Injury Fund v. Teneyck,* 317 Md. 626, 566 A.2d 94 (1989). It may, on the other hand, have been an industrial injury for which the Commission actually made an award. *Blanding v. J.H. Andrews & Sons,* 36 Md.App. 14, 373 A.2d 19 (1977). In either case, the cause of the preexisting disability itself and the possible adjudication of its legal consequences will ordinarily both be *faits accompli* before the subsequent injury even takes place. Not only is the injury or disability an established historic fact, but, more frequently than not, its

final litigation is ordinarily also an already established historic fact when the subsequent event occurs. There is, therefore, a fixed historic context in which the subsequent injury and its litigation may take place.

Such a straightforward, linear unfolding of events could have been the case here, but it was not. The litigation of the 1994 injury, which ordinarily might have preceded the litigation of the 1998 injury by as much as four years, for some reason proceeded simultaneously with it. That scheduling happenstance, however, should not blind us to the proper sequencing of the underlying events themselves. The law may not have memorialized what happened in 1994 until 2003, but the accident itself and its physical consequences were firmly fixed in 1994. Despite an instinctive tendency to look on the jury findings of March 5, 2003, as involving an indivisible entity, the litigational simultaneity of the two claims did not wrap them into a single doctrinal package.

### The Focus Is on the SUBSEQUENT Injury

This case is controlled by Subsequent Injury Fund law, although the Subsequent Injury Fund itself has, thus far, done little more than hover in the wings. We do not suggest that the Subsequent Injury Fund will necessarily be required to pay compensation to Darden in this case. It may or may not be, depending on the satisfaction of various, yet unlitigated qualifying conditions, such as those spelled out in LE § 9-802(b)(3) and (4).

Subsequent injury law focuses on the combined effect of 1) a preexisting permanent impairment and 2) a subsequent injury. If the combined effect "is substantially greater" than that which would have been caused by the subsequent injury alone, Subsequent Injury Fund law is, at least tentatively, involved. It was the claim for the 1998 injury in this case that triggered the possibility of Subsequent Injury Fund involvement.

Subsequent Injury Fund law, the core of which is found in LE § 9-802, has a double thrust. Subsection (b), its various conditions being satisfied, provides compensation to the victim

beyond that which is due from the employer. Subsection (b) provides:

(b) *Compensation from Subsequent Injury Fund.—In addition to the compensation for which an employer or its insurer is liable, the covered employee is entitled to compensation from the Subsequent Injury Fund if:*

(1) *the covered employee has a permanent impairment due to a previous accident,* disease, or congenital condition that is or is likely to be a hindrance or obstacle to the employment of the covered employee;

(2) *the covered employee suffers a subsequent compensable accidental personal injury,* occupational disease, or compensable hernia *resulting in permanent* partial or permanent *total disability that is substantially greater due to the combined effects of the previous impairment and the subsequent compensable event than it would have been from the subsequent compensable event alone;*

(3) the combined effects of the previous impairment and the subsequent accidental personal injury, occupational disease, or compensable hernia result in a permanent disability exceeding 50% of the body as a whole; and

(4) the previous impairment, as determined by the Commission at the time of the subsequent compensable event, and the subsequent accidental personal injury, occupational disease, or compensable hernia are each compensable for at least 125 weeks.

(Emphasis supplied).

Whereas the thrust of subsection (b) is to extend benefits to a covered employee, the counterthrust of subsection (a) is to limit the liability of the employer:

(a) *Limitation on liability of employer and insurer.—If* a covered employee has a permanent impairment and suffers a subsequent accidental personal injury, occupational disease, or compensable hernia resulting in permanent partial or permanent total disability that is substantially greater due to the combined effects of the previous impairment and the subsequent compensable event than it would have

been from the subsequent compensable event alone, *the employer* or its insurer *is liable only for the compensation payable* under this title *for the subsequent accidental personal injury,* occupational disease, or compensable hernia. (Emphasis supplied).

Subsection (a), exempting the subsequent employer from any liability beyond that due for the subsequent injury alone, is an absolute. The exemption is not contingent upon compensation's being recoverable from the Fund. The law does not say that *someone* is going to pay compensation for the victim's enhanced disability, and that if the Fund does not, then the employer must. There is no condition limiting the employer's exemption. Subsection (a) stands alone.

Both subsections, it must be remembered, focus exclusively on the **subsequent** injury and its deleterious effects. The employer may be liable for its immediate consequences, and the Fund, all conditions being satisfied, may be responsible for its more indirect or incremental consequences. In either event, compensation is for the **subsequent** injury and for the consequences of that **subsequent** injury on a victim with a particular physical condition. No latter-day compensation is being made for the antecedent injury. The preexisting condition resulting from it is simply the historic backdrop on which the **subsequent** injury works its impact. This focus is for the obvious reason that subsequent injury law is concerned with the combined effect of a subsequent injury and a preexisting disability. By definition, only a subsequent injury can produce a combined effect. The prior accident had nothing with which to combine.

For these reasons, the focus in this case should have been exclusively on the claim for the 1998 injury. That claim was the claim for the **subsequent** injury, around which this entire body of law revolves. It alone was the launching pad for any enhanced compensation based upon the combined effect of the preexisting disability and the subsequent injury. For a combined disability, there must, to be sure, be an apportionment. It is not, however, an apportionment between Claim A and

Claim B. It is, rather, an apportionment between 1) the prior existing disability and 2) the subsequent injury, both within the exclusive embrace of Claim B.

### The Identity of the Earlier Employer Is Immaterial to the Subsequent Injury Litigation

The prior disability may have been the result of 1) a congenital condition, *Dent v. Cahill,* 18 Md.App. 117, 305 A.2d 233 (1973); 2) an accidental injury that was not compensable, *Reliance Insurance Co. v. Watts,* 16 Md.App. 71, 293 A.2d 836 (1972); 3) a work-related injury when working for an employer other than the subsequent employer, *Subsequent Injury Fund v. Deeds,* 11 Md.App. 335, 273 A.2d 817 (1971); or 4) a work-related injury when working for the employer who also happens to be the subsequent employer, *Anchor Motor Freight, Inc. v. Subsequent Injury Fund,* 278 Md. 320, 363 A.2d 505 (1976). What matters is the preexisting disability *per se,* not responsibility for the disability.

■ Nor is it the case that two discrete injuries fuse into a single unit of compensation liability just because the same employer was, coincidentally, involved on both occasions. The unit of measurement for compensation purposes is a disability, not an employer. The legal consequences of the 1998 injury in this case would be precisely the same regardless of whether 1) the employer at the time of the earlier injury had been the same, 2) the employer at the earlier time had been different, or 3) there had been no employer involved with the earlier injury. Our concern is with the responsibility of MTA for the consequences to Darden of the subsequent injury in 1998 and with nothing else. Who, if anyone, the employer happened to have been on the earlier occasion will have no bearing on the litigation following a subsequent injury. It does not matter who, if anyone, the prior employer may have been for the reason that no compensation will be exacted for the earlier injury. The earlier injury is already history. The earlier disability itself may carry on into the present, but the accident that produced it and the legal liabilities flowing from it do not.

In trying to keep the two separate analyses in this case as distinct as possible, it may help if, instead of referring to the MTA as Darden's generic employer, we refer to Employer A (for 1994's injury A) and Employer B (for 1998's injury B). That Employer A and Employer B, by random chance, happen to be one and the same is immaterial to our analysis.

*Anchor Motor Freight, Inc. v. Subsequent Injury Fund,* 278 Md. 320, 363 A.2d 505 (1976), is instructive. The claimant in that case suffered two separate compensable accidents, one in 1961 and a second in 1966, while working for the same employer. As a consequence of his first accident, the employee suffered a fractured spine and severe injuries to both hands. The Commission, after determining that he had sustained a permanent partial disability, awarded him compensation. 278 Md. at 321, 363 A.2d 505. Whatever the future might hold for the claimant himself, the litigation of that claim was over and done with.

A subsequent injury in 1968 produced, as subsequent injuries frequently do, both immediate consequences and a more massive combined effect. Judge Digges, 278 Md. at 321, 363 A.2d 505, described the combined effect (80% industrial loss of the use of his body) and the respective percentages by which the subsequent injury (52%) and the prior disability (28%) combined to produce that ultimate (80%) effect.

> In 1966 the employee was injured in the second accident whereby he suffered a fracture to his left ankle and left shoulder blade. Following this occurrence, the Commission in 1968 found the claimant was then afflicted with *a permanent partial disability amounting to an 80% industrial loss of the use of his body, 28% due to the previous impairment associated with the 1961 accident and 52% due to the 1966 accident.*

(Emphasis supplied).

Significantly, the employer at the time of the 1961 injury (Employer A) was not charged with any of the enhanced compensation due because of the combined effect, even though it was, coincidentally, also the employer at the time of the

subsequent injury (Employer B). Any compensation beyond that due for the 1966 injury (Injury B) alone would be borne, if by anyone, by the Subsequent Injury Fund.

> *The award,* made under the "Other Cases" provision of Maryland Code *was apportioned between the employer* and insurer (the petitioners) *and the Subsequent Injury Fund* (the respondent), the employer being required to pay 52% and the Fund being responsible, with a credit for the amount previously paid in conjunction with the 1961 accident, for the remaining 28%.

278 Md. at 321–22, 363 A.2d 505. The Court of Appeals held flatly that the enhanced compensation for such a cumulative disability is compensation payable by the Fund.

> *[T]he Fund is directed to contribute* to the employee's compensation *an amount equal to the difference between the award payable for the subsequent injury alone and that payable for the second injury combined with the previous impairment.*

*Id.* at 325, 363 A.2d 505.

Even though the disability resulting from the earlier accident was deemed responsible for 28% of the combined and ultimate disability, it was the Fund that was responsible for that 28% of the award, subject to an appropriate credit for any compensation already paid. Employer A was not responsible for any part of the enhanced award, notwithstanding the coincidental fact that it also happened to be Employer B, the employer at the time of the subsequent injury. The employer at the time of the earlier injury, whoever it may be, is simply not responsible for the consequences, immediate or cumulative, resulting from the subsequent injury.

### The Claim for the 1994 Injury

█ This case is a textbook example of what not to do. In applying what should have been subsequent injury law, the entire litigation, particularly on the remand to the Commission, allowed its attention to wander away from the **subsequent** injury and to focus, completely inappropriately, on the

prior injury. The litigation of Darden's claim for his 1994 injury, ironically, had presented no legal problem. That claim should have been quickly and quietly disposed of. Had that been done, it would have been factored out of the subsequent proceedings. Darden was injured on the job on January 18, 1994. The Commission found that he had suffered a permanent partial disability under the "other cases" subsection. The Commission awarded him compensation of $170 per week for a period of 215 weeks. Significantly, Darden had no apparent quarrel with that award. There was no reason, therefore, for him to seek judicial review of it by way of his appeal *de novo* on March 3, 2003.

To be sure, had Darden been trying to establish that his 1994 injuries had caused, for example, a 60% industrial loss of the use of his body rather than the 43% loss found by the Commission, an appeal *de novo* would have made perfect sense. See *Baughman Contracting Co. v. Mellott,* 216 Md. 278, 284–86, 139 A.2d 852 (1958); *Ralph v. Sears Roebuck & Co.,* 102 Md.App. 387, 395–97, 649 A.2d 1179 (1994). Had he prevailed in such an effort, he would have increased his period of compensation from 215 weeks to 300 weeks. Darden, however, was making no such effort to increase his award for his 1994 injuries. He had very good reason to appeal the award for his 1998 injury, but he had no reason to appeal his award for the 1994 injury.

Although the skimpy record we have of the jury trial of March 3–5, 2003, does not tell us the formal basis for Darden's seeking judicial review, and does not give us the benefit of any of the trial proceedings, we can infer all we need to know from the list of nine factual issues that were submitted to the jury for its determination. There has been no suggestion that those questions did not embrace every issue with respect to which judicial review had been sought. There was no objection, then or now, to the inclusiveness of that set of issues. The issues submitted were:

1. Do you find that the Claimant, Percy W. Darden is permanently and totally disabled as a result of the January 18, 1994 injury?

Yes ____ No ____

If your answer to No. 1 is YES, stop here.

If your answer to No. 1 is NO, proceed to No. 2

2. Do you find that the Claimant, Percy W. Darden, is permanently and totally disabled as a result of the July 9, 1998 injury?

Yes ____ No ____

If your answer to No. 1 is YES, stop here.

If your answer to No. 1 is NO, proceed to No. 3.

3. Do you find that the Claimant, Percy W. Darden, is permanently and totally disabled as a result of the combination of the January 18, 1994 injury and July 9, 1998 injury?

Yes ____ No ____

If your answer to No. 3 is YES, proceed to No. 4 and No. 5.

If your answer to No. 3 is NO, skip No. 4 & No. 5 and proceed to No. 6 & No. 7.

4. What percentage of Percy W. Darden's industrial loss of use of body (permanent total disability) do you find as a result of the January 18, 1994 injury?

_____%

Proceed to No. 5

5. What percentage of Percy W. Darden's loss of use of leg (permanent total disability) do you find as a result of the July 9, 1998 injury (left knee)?

____%

Proceed to No. 8

6. What percentage of Percy W. Darden's industrial loss of use of body (permanent partial disability) do you find as a result of the January 18, 1994 injury?

_____%

Proceed to No. 7

7. What percentage of Percy W. Darden's loss of use of leg (permanent partial disability) do you find as a result of the July 9, 1998 injury (left knee)?

    _____%

    Proceed to No. 8

8. What percentage of disability do you find due to pre-existing condition(s)?

    _____%

    Proceed to No. 9

9. Do you find the pre-existing condition(s) a hindrance or likely to be a hindrance to claimant's employment? Yes _____ No _____

That entire line of questioning concerned exclusively the subsequent injury of 1998, most particularly the combined effect of it and the preexisting disability. "Did the two combine to produce either a permanent total disability or a permanent partial disability?" "In either event, what were the proportionate contributions of 1) the subsequent injury and 2) the preexisting partial disability?" None of the questions concerned the 1994 injury *per se* nor did those questions seek in any way to recalibrate the compensation for the 1994 claim. Darden simply did not challenge that award, and its continuing presence in the ongoing proceedings was both completely gratuitous and ultimately distracting.

It is obvious that Darden was operating on the erroneous assumption that, in order for the preexisting disability to be considered in conjunction with the subsequent injury, it was somehow necessary for him to appeal his award for the 1994 injury. That, of course, was not the case. The litigation with respect to the subsequent (1998) injury and all of its incremental sequelae could have proceeded just as they did (or should have), even if the 1994 claim had been finally litigated and closed years, or even decades, before.

The *de novo* jury's finding that 70% of Darden's condition as of 1998 was attributable to the disability he had been suffering since 1994 is not the same thing as a finding that he had

suffered a 70% loss of the use of his body as of 1994. The latter finding, had it been made (it was not), would have supported an upward adjustment of the award for the 1994 claim. The former finding, the one that was made, would only support an upward adjustment of the award for the 1998 claim.

In any event, it is clear that Darden was not seeking judicial review of anything concerning his award for the 1994 injuries *per se*. None of the jury's answers to issues affected the Commission's award for the 1994 injuries in any way. That award, therefore, should have stood completely undisturbed. Erroneously, however, the circuit court's order of March 7, 2003, reversed the award for the 1994 injury, as well as the award for the 1998 injury, and remanded both claims to the Commission "for Modified Orders consistent with the verdict of the jury." The first domino had fallen.

Once back before the Commission, the error snowballed. The only finding made by the jury with respect to the 1994 disability had been made because of the permanent total disability that only came about when the subsequent injury combined with that preexisting disability. Nothing about the prior claim itself was on the table for reconsideration. The earlier disability was simply a part of the historic background on which the subsequent injury operated.

As the issues submitted to the jury reflected, there was, very definitely, a potential involvement of the Subsequent Injury Fund. Accordingly, the jury apportioned responsibility for 1998's permanent total disability to the subsequent injury (30%) and to the preexisting disability (70%). Pursuant to that apportionment, Employer B would be responsible for 30% of the enhanced compensation and the Fund, at least potentially, would be responsible for the remaining 70% of the compensation, subject to a credit for whatever compensation had already been paid by Employer A on the award for the 1994 claim. LE § 9–804(b); *Gray v. Subsequent Injury Fund*, 71 Md.App. 656, 659–61, 527 A.2d 54 (1987) ("That prior compensation payments may be allowed the Fund as a credit

in any award made against it seems beyond dispute."); *Subsequent Injury Fund v. Chapman*, 11 Md.App. 369, 377, 274 A.2d 870 (1971).

The apportionment of a share of the 1998 permanent total disability to the preexisting disability was not in any way an aspect of the litigation of the 1994 claim. It was, rather, an integral part of the litigation of the subsequent injury claim, the 1998 claim. On remand, however, the Commission erroneously attributed to Employer A, for the 1994 accident, a proportionate share of liability for the permanent total disability, an apportionment that had been made by the jury for sole purpose of determining potential Subsequent Injury Fund liability.1994 liability, by definition, cannot conceivably be based on a subsequent event that will not occur until four years into the future. *Cline v. City of Baltimore*, 13 Md.App. 337, 343, 283 A.2d 188 (1971), *aff'd*, 266 Md. 42, 291 A.2d 464 (1972) ("Without question, the liability of the employer to make workmen's compensation payments for injuries to the workman . . . is fixed at the time of the accident.").

In the hands of the Commission on remand, however, the very basis for the 1994 award was transformed from one predicated on permanent **partial** disability into one predicated on a share of permanent **total** disability, a condition that did not even exist in 1994 and should not have entered into any award for that earlier claim. A weekly payment of $170 escalated into a weekly payment of $510. A total dollar figure of $36,550 climbed to a dollar figure "not to exceed the sum of $178,478." The potential liability of the Subsequent Injury Fund for the enhanced disability became the assigned liability of Employer A. This was no upward adjustment of the Commission's award for the 1994 claim. That was no longer a calculation based on a permanent partial disability pursuant to LE § 9–627(k). It was a total transmutation of the award, with the bulk of the subsequent injury claim being, anachronistically and erroneously, tacked on to the 1994 claim.

We hold that the circuit court's subsequent affirmance of the Commission's order with respect to the 1994 claim must be

and is hereby reversed. This error could never have happened, of course, if the award for the 1994 claim, which was not being actually challenged, had not unnecessarily cluttered up the proceedings. Had the 1994 claim been finally litigated before the 1998 claim came to court, there would have been no such clutter. Had the employer on the 1994 claim been different than the employer on the 1998 claim, there would have been no such clutter. Had the preexisting disability been the result of a non-compensable condition, there would have been no such clutter. Unfortunately, however, there was such clutter.

### A Core Purpose of Subsequent Injury Law: Exempting the Employer From Excessive Liability

As we now turn our focus on the award for the subsequent injury of 1998, it behooves us to look at the two core principles of Subsequent Injury Fund law. The first is to protect the covered employee, under certain conditions, from the calamitous consequences of a subsequent injury heaped on top of a preexisting disability. In *Subsequent Injury Fund v. Howes*, 11 Md.App. 325, 329–30, 274 A.2d 131 (1971), Judge Powers carefully traced the history of Maryland's ameliorative efforts, beginning with the creation of the Second Injury Fund in 1945:

> The concept of providing some means of compensating an injured employee for that portion of disability which preexisted the injury upon which a current claim is based was first introduced into the law of Maryland when Acts of 1945, ch. 637 was passed and became effective on June 1, 1945. This act created a special fund known as the "Second Injury Fund" and provided that if an employee who had previously lost or lost the use of a hand, arm, foot, leg or eye, lost another of those members or organs in a compensable accidental injury and thereby became permanently and *totally* disabled, the employee was entitled to receive additional compensation beyond that awarded against the employer for the current injury, such additional compensation to be paid from the Second Injury Fund....

*The intent of the 1945 act was stated to be, " \* \* \* to make the total payments to which such employee shall become entitled equal to the compensation that would be due for permanent total disability." . . .*

The Second Injury Fund thus created appeared to operate satisfactorily without major statutory change and without appellate judicial interpretation until 1963.

(Emphasis supplied).

Coverage was significantly broadened with the creation of the Subsequent Injury Fund, in essentially its current form, in 1963.

*Acts of 1963,* ch. 809, codified, *accomplished a major broadening of the original concept. The Subsequent Injury Fund was created* and succeeded to the function of and pending claims against the Second Injury Fund. Orders by the Commission for payment from the Fund were no longer limited to cases of permanent *total* disability caused by the loss of a second enumerated member or organ. *The 1963 changes provided for payments of additional compensation to an injured employee who sustained any injury in a compensable accident while previously suffering any kind of permanent impairment* due to a previous accident or a disease or any congenital condition provided that the end result was permanent total disability *or* permanent partial disability exceeding 50% of the body as a whole.

11 Md.App. at 330, 274 A.2d 131 (emphasis supplied).

In Labor and Employment Article, Title 9, dealing with Worker's Compensation, Subtitle 8 deals with Subsequent Injuries. Section 9–801 sets out the Subtitle's "Statement of intent."

*When a covered employee has a permanent impairment, suffers a subsequent accidental personal injury,* occupational disease, or compensable hernia *resulting in* permanent partial or *permanent total disability, and otherwise meets the requirements of this subtitle, it is the intent of this subtitle that the total compensation to which the covered*

*employee is entitled equal the amount of compensation that would be payable for the combined effects of:*

(1) *the previous impairment; and*

(2) *the subsequent accidental personal injury,* occupational disease, or compensable hernia.

(Emphasis supplied).

Section 9–802(b) then implements that legislative intent by providing "Compensation from [the] Subsequent Injury Fund" whenever, *inter alia*, the covered employee 1) has a permanent impairment due to a previous accident; and 2) suffers "a subsequent compensable accidental personal injury . . . resulting in permanent . . . total disability that is substantially greater due to the combined effects of the previous impairment and the subsequent compensable event than it would have been from the subsequent compensable event alone."

Inextricably intertwined with that purpose of benefitting the injured employee is the second core principle—the provision that the enhanced compensation due to the employee because of the double-barreled impact of the subsequent injury and the preexisting disability will be borne by the Subsequent Injury Fund and not by the employer. Section 9–802(a) expressly provides that

*the employer* or its insurer *is liable only* for the compensation payable under this title *for the subsequent accidental personal injury,* occupational disease, or compensable hernia.

(Emphasis supplied).

A primary purpose for the Subsequent Injury law's solicitude for the employer is the scrupulous avoidance of any disincentive that an employer might have for 1) hiring an employee with a prior disability or 2) retaining an employee who incurs a disability. In either case, the law assures the employer that it will not be at risk of paying enhanced compensation because of the vulnerable physical condition of the hired or retained employee. Judge Finan articulably expressed the law's purpose in *Subsequent Injury Fund v. Pack,* 250 Md. 306, 308, 242 A.2d 506 (1968):

The Subsequent Injury Fund (Fund) was created by Chapter 809 of the Acts of Maryland 1963. *Its purpose was to persuade the employer to employ the handicapped individual by limiting the liability,* which the employer may otherwise have incurred, *in the event the previously disabled or injured individual sustained a subsequent occupational injury,* although not of itself disabling, but which, coupled with previous impairment, rendered the individual permanently disabled, *thus exposing the employer to liability for the cumulative effect of the prior and subsequent injuries.* By the terms of the statute, if the employee sustained a subsequent compensable disability but the cumulative effect of the disability and the prior disability resulted in a permanent total or permanent partial disability, *the employer* and his insurance carrier *would only be liable for compensation payable by reason of the subsequent injury. The Subsequent Injury Fund would contribute the balance of the total award,* so that the sum of the two payments would equal the compensation provided by statute for the combined effects of both the previous disability and the subsequent injury.

(Emphasis supplied).

Judge Digges subsequently summarized the law's effect in *Anchor Motor Freight v. Subsequent Injury Fund,* 278 Md. at 326, 363 A.2d 505:

Consequently, *the employer [is] not penalized for hiring a worker with a preexisting impairment.*

(Emphasis supplied). Judge Rodowsky also put the law's purpose very succinctly in *McKenzie v. C.C. Kottcamp & Sons,* 311 Md. 54, 57, 532 A.2d 703 (1987):

*The policy* of limiting the employer's liability for compensation to that payable for the subsequent injury *is designed to encourage employers to hire handicapped persons.*

(Emphasis supplied).

The way to encourage the continued employment of partially disabled workers is to make certain that the cost associated with the enhanced risk of cumulative injury will be borne,

under appropriate circumstances, by the Fund. In *Subsequent Injury Fund v. Teneyck,* 317 Md. 626, 632, 566 A.2d 94 (1989), Judge William Adkins stressed that the burden of enhanced compensation is on the Fund and not on the employer:

This purpose is achieved by assuring that *if an employer hires a worker with a prior impairment, and if that worker suffers a compensable injury on the current job, then the employer is liable only for the subsequent injury* and not the "cumulative effect of the prior and subsequent injuries." *The Fund ordinarily makes up the balance,* since it must "contribute to the employee's compensation an amount equal to the difference between the award payable for the subsequent injury alone and that payable for the second injury combined with the previous impairment."

(Emphasis supplied).

This Court has regularly acknowledged that the shielding of the employer from excessive liability is not only protective of the employer but is indispensable to the welfare of the employed worker. In *Barbee v. Hecht Co.,* 61 Md.App. 356, 361, 486 A.2d 785 (1985), Judge Getty said for this Court:

The Fund was established in order to encourage employers to hire workers despite their impairments. *The Fund furthers this purpose by relieving employers of all liability for the percentage of overall disability attributable to their workers' pre-existing impairments.*

(Emphasis supplied).

Judge William Adkins wrote to a similar effect in *C & P Telephone Co. v. Subsequent Injury Fund,* 53 Md.App. 508, 511, 453 A.2d 1243 (1983):

*[I]t is important to keep in mind the purpose the Fund is intended to serve.* This purpose is to limit the liability of an employer who hires a handicapped individual who subsequently dies or becomes seriously disabled because of the combined effects of an injury on the job and a prior

handicap or impairment. Generally speaking, *this limitation is achieved by allocating to the employer liability for the effects of the subsequent injury and to the Fund the liability for the effects of the prior impairment.*

(Emphasis supplied).

In *Subsequent Injury Fund v. Chapman,* 11 Md.App. 369, 372 n. 2, 274 A.2d 870 (1971), Chief Judge Robert C. Murphy encapsulated the principle in a nutshell:

In simple terms, the employer was liable only for the compensation payable for the current injury; *the Fund was obligated to pay the rest.*

(Emphasis supplied).

A subsequent injury scenario is a classic situation in which a whole may, indeed, be greater than the sum of its parts. Two permanent partial disabilities may combine to produce a permanent total disability, even when the two fractional disabilities, each considered in a vacuum, might not add up to 100%. In *Reliance Insurance Co. v. Watts,* 16 Md.App. 71, 75, 293 A.2d 836 (1972), Judge Powers posed a hypothetical situation illustrating the potential problems.

If one should assume that *a person with perfect sight in one eye, though blind in the other, may retain 90% of the industrial use of his body as a whole,* it would be clear that *loss of his remaining sight would render him totally disabled. It could be said* as a medical fact *that the subsequent injury resulted in the loss of the 90% industrial use of the body as a whole which he had before the second injury.* If the contention of the Subsequent Injury Fund were sound, the current employer and his insurer would be responsible for this 90% loss. *The risk of this responsibility is precisely the risk against which § [9–802(a) ] protects the employer.* If it did not afford that protection, the purpose of the legislation, "to persuade the employer to employ the handicapped individual by limiting the liability, which the employ-

er may otherwise have incurred" would be defeated at the start.

(Emphasis supplied).

## Calculating Subsequent Employer Liability

Although an earlier employer may have been liable to pay compensation for the direct and immediate consequences of the prior injury that produced the prior disability, there is no case in which that earlier employer (Employer A), following the occurrence of a subsequent injury, has ever been held responsible for even a proportionate share of a permanent total disability attributable to that prior disability, above and beyond any compensation paid or due for the earlier injury alone, considered in a vacuum.[1]

---

1. By way of supplemental, post-oral argument communication, the appellee (MTA) directs our attention to and relies upon *Marshall v. University of Maryland*, 161 Md.App. 379, 869 A.2d 391 (2005). We are very aware of the *Marshall* opinion, but do not find it apposite to the issues before us.

*Marshall*, to be sure, deals with an "apportionment" of injuries between an earlier and a later accident, but it has nothing to do with Subsequent Injury Fund law or even with a situation where the combined effect of two injuries is potentially greater than the sum of the parts. *Marshall* does not deal with Subtitle 8 in any way.

*Marshall's* concern, following the arguably ill-advised consolidation of two claims, was whether 1) the compensation due for injuries to various scheduled members should all be calculated at the higher rate applicable at the time (2001) of the later injury or 2) the compensation for the injury to the right knee (injured in 1999) should be based on the lower rate that applied in 1999. Our discussion of apportionment in *Marshall* was exclusively in that context:

> [T]he Commission erred because it failed to apportion the PPD percentage between the 1999 and 2001 incidents. . . . [W]here separate accidental injuries occur, the Commission must determine the PPD percentage caused by **each** accident, and award compensation accordingly.

A valid apportionment for one purpose is not an automatic imprimatur of the verb "apportion" at all times for all purposes. As Judge Powers pointed out in *Reliance Insurance v. Watts*, 16 Md.App. at 73, 293 A.2d 836:

> The declared legislative policy that "the employer or his insurance carrier shall be liable only for the compensation payable under this article for such injury" *does not open the door to apportionment as the*

With respect to the liability of the employer at the time of the subsequent injury (Employer B), the caselaw spells out precisely how that employer's share of responsibility for the cumulative permanent disability (partial or total) shall be calculated. Much of the thinking of both appellate courts on this subject was pioneered by Judge Powers. In *Reliance Insurance Co. v. Watts,* 16 Md.App. at 75, 293 A.2d 836, he concluded:

> We hold that *"the compensation payable* under this article for such injury," referring to a subsequent injury which calls for the application of § [9–802(a)], *must be determined upon the assumption that the employee had no pre-existing "permanent impairment due to previous accident* or disease or any congenital condition, which is or is likely to be a hindrance or obstacle to his employment."

(Emphasis supplied).

Judge William Adkins, who wrote extensively on Subsequent Injury law for both this Court and then the Court of Appeals, adopted the *Reliance Insurance* standard of measurement in *C & P Telephone Co. v. Subsequent Injury Fund,* 53 Md.App. at 511, 453 A.2d 1243:

> In disability cases involving § [9–802(a)], this *limiting* [the liability of an employer] effect *is achieved by first determining the extent of disability that would have been caused by the subsequent injury, had there been no prior impairment,* and requiring the employer to pay compensation to that extent.

(Emphasis supplied).

A year later, the Court of Appeals, speaking through Judge Rodowsky, employed the same measuring rod in *Subsequent Injury Fund v. Kraus,* 301 Md. 111, 112, 482 A.2d 468 (1984):

---

*commission and the court below applied it,* but requires the precise determination of the compensation payable for the current injury. (Emphasis supplied). Beguiled by little more than the use, in different contexts, of the word "apportion," the appellee is comparing apples and oranges.

*[T]he employer is responsible for* so much of the award as equals compensation payable for *that disability which the subsequent injury would have caused, absent the `prior impairment,* and that the Fund is responsible for the balance of the award.

(Emphasis supplied).

## The Claim for the 1998 Injury

The subsequent injury in this case occurred on July 9, 1998, when Darden injured his left knee while climbing into a subway train cab in the course of a requalification test. For that injury alone, the Commission found that Darden had suffered a permanent partial disability, consisting of a 15% loss of the use of the left knee. He was awarded compensation for a period of 45 weeks (15% of 300 weeks). Darden, as was his right, sought a judicial review of this award by way of an appeal *de novo.*

## The Riddle of the *De Novo* Findings

If some of the problems in this case are attributable to Darden's pointless appeal of his award for the 1994 injury, yet other problems are attributable to what the jury did, on *de novo* appeal, with the 1998 award. Shall we apportion shares of blame?

A shroud of mystery envelopes Issue and Answer # 5. If we were to look at it in a vacuum, we would have to conclude that we cannot be certain what was meant by either the question or the answer.

5. What percentage of Percy W. Darden's loss of use of leg (permanent total disability) do you find as a result of the July 9, 1998 injury (left knee)?

   *30%*

Following the phrase "percentage of," what is the object of the preposition "of"? Is it "loss of use of leg" or is it "permanent total disability"? It could plausibly be either and it is impossible to solve the riddle from the internal wording alone.

Did the jury find that the 1998 injury to the left knee was more serious than the Commission had found; that the percentage of the loss of the use of the knee was higher; and that, when implemented by the Commission, 90 weeks of compensation (30% of 300 weeks) for injury to a scheduled member would be more appropriate than 45 weeks? The precise doubling of the percentage of loss of use, from 15% to 30%, would support the plausibility of such a conclusion.

Or did the jury find, for the first time that anyone had so found, that the 1998 injury was responsible for 30% of Darden's permanent total disability? The fact that the "30%" answer to Issue # 5 and the "70%" answer to Issue # 4 neatly add up to 100% would support the plausibility of such a conclusion.

If we had before us the precise factual issues, if any, that might have been mentioned in the request for judicial review, that would help to solve the mystery. We do not. If we had before us the evidence that was offered or the arguments that were made in the course of the three-day jury trial, that would help to solve the mystery. We do not. Was the *de novo* battle waged over the combined impact of the subsequent injury and the preexisting impairment? Or did the controversy revolve about the left knee specifically? We have no direct knowledge either way.

Fortunately, however, we are not required to look at Issue and Answer # 5 in a vacuum. From the context of the nine issues that were submitted to the jury and the seven answers returned by the jury, we infer that the jury's answer of "30%" to Issue # 5 referred to 30% of Darden's permanent total disability and not to a 30% loss of the use of the left knee. The first five issues submitted were all closely related parts of a single larger inquiry. They all concerned Darden's permanent total disability. If any one of the questions had been missing, the total inquiry would have been bizarrely incomplete. Issue # 1 asked if there was a permanent and total disability as a result of the 1994 injury alone. The jury said, "No." Issue # 2 asked if there was a permanent and total

disability as a result of the 1998 injury alone. The jury said, "No." Issue # 3 then asked if there was a permanent and total disability as a result of the 1994 and 1998 injuries combined. The jury said, "Yes."

As a direct result of that answer, the jury was then instructed: "If your answer to No. 3 is YES, proceed to No. 4 and No. 5." No. 4 and No. 5 were a complementary package. Issue No. 4 asked what percentage of the permanent total disability was a result of the 1994 injury. The jury answered, "70%." Indicating that the two answers were necessarily tied together, the jury, after answering No. 4, was explicitly directed, "Proceed to No. 5." However inartfully and ambiguously it may have been phrased, Issue # 5 then completed the five-issue package by seeking to know what percentage of the permanent total disability was a result of the 1998 injury. The jury answered, "30%." No. 4 and No. 5 were necessarily related, complementary issues.

If the jury answer to Issue # 3 had been that Darden had not suffered a permanent total disability, then complementary Issues # 6 and 7, inquiring into the respective percentages of responsibility of the 1994 and 1998 injuries for Darden's permanent **partial** disability, were to be answered as a package, just as Issues # 4 and 5 had been an indivisible package with respect to permanent **total** disability. Our conclusion with respect to the meaning of Issue and Answer # 5 may have been inferential, but it is, in the last analysis, indisputable.

### The Subsequent (1998) Injury Award on Remand

When the two awards came back to the Commission on remand from the circuit court, the Commission seemed to understand the significance of the jury's answers to Issue 3, 4, and 5, in combination, just as we understand it. In its Award of Compensation for the 1994 injury, the Commission answered Issue # 6 before it with the following response:

*The claimant is permanently totally disabled as a result of the combination of the January 18, 1994 and July 9, 1998 injury. 70% of said disability is the result of the January 18,*

*1994 injury and 30% thereof is due to the* July 9, *1998 injury* to the left knee.

(Emphasis supplied). The 1998 injury may have been literally "to the left knee," but its 30% share of responsibility was unquestionably for Darden's permanent total disability.

As the Commission proceeded from the reformation of the 1994 award to the reformation of the 1998 award, however, something inexplicable happened. It suddenly treated the jury's response to Issue # 5 as if it had had reference to a limited injury to a scheduled member (the left knee or left leg) in a vacuum and had no reference to the permanent total disability or to the 1998 injury's contribution thereto. Although the Commission had, on its disposition of the companion claim, taken apparent cognizance of the 70% proportion of the permanent total disability attributable to the 1994 injury, it chose to ignore the 30% responsibility attributable to the 1998 injury.

As a direct result of misinterpreting the jury's finding, the Commission further ruled that the compensation period of 90 weeks for the injury to the left knee was not enough to establish Subsequent Injury Fund involvement pursuant to LE § 9–802(b)(4). There is inherent in the Commission's reasoning a "Catch 22" paradox. The reason the Commission could ignore the 30% contribution to the permanent total injury was because the Fund was not involved and no apportioning would be necessary. But the reason the Fund was not involved was because the Commission had ignored the 30% contribution to the permanent total disability. Captain Yosarian would have felt the pain.

We hold that the Commission's award for the 1998 injury on remand, based on its erroneously narrow reading of the jury's findings, was in error.

## CONCLUSION

█ The whole in this case is significantly greater than the sum of its parts. The first and the greater of the two parts, the ultimately undisturbed award for the 1994 injury, was for

a permanent partial disability at the rate of $170 per week for a period of 215 weeks, for a total payment of $36,550. The second part, the ultimately undisturbed award for the 1998 injury, was for a permanent partial disability at the rate of $94.20 per week for a period of 45 weeks, for a total payment of $4,239. The sum of the two parts would be compensation for a period of 260 weeks in the total amount of $40,789.[2]

The whole in this case would, indeed, be significantly greater than the sum of these parts. Based on the jury's finding that the combination of the 1994 and 1998 injuries produced a permanent total disability, the Commission, on remand on June 17, 2003, correctly ruled that Darden had suffered a permanent total disability. Although the Commission never finalized the amount of compensation that would be due for that permanent total disability, its partial award indicated that the compensation for the whole would be significantly greater than the sum ($40,789 or even $53,740) of the parts. Based on the jury's finding that 70% of the permanent total disability was attributable to the preexisting injury from the 1994 accident, the Commission, on some reckoning beyond our ken, multiplied $510 per week by 350 weeks and came up with $178,478 as the 70% portion of Darden's permanent total disability.[3]

When the whole, whatever the final dollar amount might be, is substantially greater than the sum of its parts, it is the Subsequent Injury Fund, if anyone, that is responsible for the

---

2. Even if one were to accept the interpretation that the jury's finding on the appeal *de novo* had had the effect of increasing the award for the 1998 injury to one of $191 per week for a period of 90 weeks, even then, the sum of the two parts would have been compensation for 305 weeks in the total amount of $53,740.

3. Although the Commission, on remand, recognized that the jury had determined 1) that Darden, as a result of the subsequent injury combined with the preexisting disability, had suffered a permanent total disability; and 2) that 70% of that total disability was attributable to the 1994 injury, it then seemed to calculate its reformed award for the 1994 injury on the basis of a permanent partial disability, under LE § 9–627(k), without any recognition of the fact that the disability had been enhanced into a greater and permanent one by the subsequent injury.

difference, and not the employer. The employer is not responsible even if, for some reason, the Fund is excused from liability.

In subsequent injury law, moreover, it is, by definition, the award for the subsequent injury that carries with it the possibility of enhanced compensation and Fund involvement. That baggage is not borne by the possible award for the injury that produced the preexisting disability.

Both of those basic principles were offended in this case. The enhanced compensation for the combined effect of prior impairment and subsequent injury was imposed upon the employer and not upon the Fund. That is error. The enhanced package, moreover, was attached to the 1994 award and not to the award for the subsequent (1998) injury. That is error. Darden may have been entitled to a bigger award than he received. He may have been due enhanced compensation for a permanent total disability. If so, however, it was from a different defendant and on a different claim.

### Subsequent Injury Fund Involvement

What, then, are the implications of our reversal for Darden? The jury's *de novo* findings of fact determined that, as a result of the subsequent injury of 1998's combining with the preexisting impairment from 1994, Darden suffered a permanent total disability. The jury further determined that 30% of responsibility for that total disability was attributable to the 1998 injury. At that point, the Commission should have calculated the compensation that would be due to Darden for his permanent total disability. Employer B would be liable for 30% of that total compensation figure.

The jury had also found that 70% of the responsibility for the permanent total disability was attributable to the prior impairment (resulting from the 1994 injury). Potentially at least, the Fund would be liable for 70% of the total compensation figure, subject to a credit for whatever compensation Darden had received or was about to receive from Employer A.

The involvement of the Subsequent Injury Fund is governed by Subtitle 8 and particularly by LE § 9–802(b). In *Subsequent Injury Fund v. Thomas*, 275 Md. 628, 632, 342 A.2d 671 (1975), Judge Eldridge wrote of the conditions that must be satisfied for the Fund to be deemed liable.

> [A] claimant is entitled to receive benefits from the Subsequent Injury Fund only when several conditions are satisfied. *First, the employee must have a "permanent impairment due to a previous accident* or disease or any congenital condition, which is or is likely to be a hindrance or obstacle to his employment." *Second, the employee must incur "a subsequent disability by reason of a personal injury,* for which compensation is required by" the Workmen's Compensation Act. Finally, *the "previous impairment and subsequent accidental injury,"* when combined, *must result in total disability or a permanent partial disability which exceeds 50% of the body and* which *is "substantially greater ... than that which would have resulted from the subsequent injury alone."*

(Emphasis supplied).

One additional precondition was listed by Judge William Adkins in *Subsequent Injury Fund v. Teneyck,* 317 Md. 626, 632–33, 566 A.2d 94 (1989), as he described the

> conditions that must exist before the Fund is brought into the picture. They are: (1) that the combined effects of the previous impairment and the subsequent injury must result in a permanent disability that exceeds 50 percent of the body as a whole; and (2) that *the previous impairment and the subsequent injury are each compensable, "as determined by the Commission," for not less than 125 weeks.*

(Emphasis supplied).

### Out of the Wings And Onto Center Stage

Although it is sorely tempting to make a final pronouncement with respect to the involvement of the Fund, it is not fitting that we should do so. Throughout every stage of this case, the Fund has been, at the very least, hovering closely in

the wings. Its role, however, has remained, through no fault of its own, nebulous. At every opportunity, the Commission, on both claims and at both the initial hearing and on remand, has declared the Fund to be uninvolved. All parties to this appeal treat the Fund as uninvolved, despite what seems to us to be strong indications to the contrary. Before being held to be involved, the Fund is entitled to a formal opportunity to respond and to offer whatever defenses it may have to its liability.

The Subsequent Injury Fund may be made a formal party to the case at any time. Section 9–807(b)(1) is explicit:

> (b) *Time of impleading.*—(1) *The Subsequent Injury Fund may be impleaded* at any stage of the proceedings:
>
> (i) before the Commission; or
>
> (ii) *on appeal.*

(Emphasis supplied). Section 9–807(b)(2) then makes it clear that the Fund must be given a formal "opportunity to defend against the claim."

> (2) If the Subsequent Injury Fund is impleaded on appeal before a circuit court or the Court of Special Appeals, *the court shall:*
>
> (i) suspend further proceedings; and
>
> (ii) *remand the case to the Commission for further proceedings to give the Subsequent Injury Fund an opportunity to defend against the claim.*

(Emphasis supplied). See *Eastern Stainless Steel v. Nicholson,* 306 Md. 492, 510 A.2d 248 (1986).

As Judge Cathell pointed out for this Court in *Subsequent Injury Fund v. Ehrman,* 89 Md.App. 741, 751, 599 A.2d 875 (1992), the Fund must be afforded the opportunity to defend a claim before any award may be made against it.

> *The Act requires that the Fund be impleaded* as a person and party *to defend against the claim* or action *before any award can be made against it.* The existence of a subsequent accident and a causal connection are prerequisites for establishing the fund's liability. To hold that the Fund is

not entitled to challenge the conditions precedent to a claim against it would be to make meaningless the Legislature's granting to the Fund status as a party with an opportunity to defend. It is clear that when the Legislature conferred party status on the Fund it was as a full, not a titular, party. (Emphasis supplied). Our opinion made it very clear that if that impleading of the Fund results in some delay in ultimately resolving the case, so be it.

> *The claimant, the employer, and the Commission have the right to implead the Fund. If the timing of that impleading requires issues to be relitigated, it is through no fault of the Fund.* The necessity for relitigation is, under those circumstances, caused by the failure of the other parties or the Commission to implead the Fund at an earlier stage.

> Accordingly, we hold that *when the Subsequent Injury Fund is impleaded at any stage of a proceeding it has the right to assert a complete defense to the claim against it,* including raising the issues of accidental injury and causal connection.

89 Md.App. at 52, 597 A.2d 489 (emphasis supplied).

At the remand before the Commission, the Fund may be impleaded 1) by Darden, 2) by the MTA, or 3) by the Commission itself *sua sponte.* The Fund must, however, very definitely be impleaded before any award may be made against it. In this case, however, no further formal or ceremonial impleading of the Subsequent Injury Fund will be required. The Fund has, at the very least, been hanging around the ballpark since the opening pitch. On the second appeal to the circuit court in February of 2004, the Fund participated in the oral argument. On this appeal, the Fund is listed as one of the appellees. It submitted an appellee's brief of its own.

Because, however, every ruling at every stage of these proceedings has treated the Fund as uninvolved, and because both Darden and the MTA have chosen to regard the Fund as uninvolved, the Fund has never actually been called upon to contest its liability pursuant to LE § 9–802(b). As our discus-

sion throughout this opinion has stressed, however, indications of potential Fund involvement are very definitely blowing in the wind. Under the circumstances, the Fund should be afforded the opportunity, on remand of the case to the Commission, to argue any defenses to its liability that it may wish to assert.

The language of Judge Deborah Eyler for this Court in *Carroll v. State of Maryland,* 136 Md.App. 319, 328, 765 A.2d 998 (2001), is particularly pertinent in pointing out that the prior failure in this case to have found any involvement by the Fund is not at all foreclosing, and that all that is needed for impleading the Fund are "conditions for payment by the Fund [that] may be found, even though they have not yet been found."

> The pertinent language of LE § 9–807 makes plain that, so long as the case is one "involving payment from the Subsequent Injury Fund," *the Fund may be impleaded at any stage of the proceedings, including before the Commission, before the circuit court on appeal, or before this Court.* Given that the statute concerns the process for bringing the Fund into a case, at any stage of the proceedings, for the purpose of allowing it to "defend the claim," it likewise is clear that cases *"involving payment by the Subsequent Injury Fund" are not limited to those in which there already has been a finding that the conditions requisite for payment by the Fund have been met.* Rather, cases *"involving payment by the Subsequent Injury Fund"* must *include those in which the conditions for payment by the Fund may be found, even though they have not yet been found.*

(Emphasis supplied).

### Afterthought

Just as the verb "apportion" has different meanings in different contexts, so does the verb "enhance." When two accidents occur sequentially, and could be litigated sequentially, but are litigated simultaneously, the risk of error is greatly enhanced.

272

JUDGMENTS REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR IT TO REMAND TO WORKERS' COMPENSATION COMMISSION FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE DIVIDED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEE, MTA.